IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ATLAS BREW WORKS, LLC,           )   Civil Action No. 19-0079-CRC
                                 )
        Plaintiff,               )
                                 )
        v.                       )
                                 )
WILLIAM P. BARR, in his official capacity as   )
Attorney General of the United States,         )
                                 )
        Defendant.               )
_____   )


MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

Plaintiff Atlas Brew Works LLC submits the following memorandum of points and

authorities in opposition to Defendant's motion to dismiss.

Dated: March 14, 2019          Respectfully submitted,

                               Alan Gura (D.C. Bar No. 453449)
                               Gura PLLC
                               916 Prince Street, Suite 107
                               Alexandria, VA 22314
                               703.835.9085/Fax 703.997.7665


                          By:  /s/ Alan Gura
                               Alan Gura

                               Attorney for Plaintiff Atlas Brew Works LLC

TABLE OF CONTENTS

Table of Authorities........................................................ ii

Introduction.............................................................. 1

Standard of Review........................................................ 2

Statement of Facts........................................................ 3

     1.     *The Prior Restraint on Beer Label Speech*.................................. 3

     2.     *The Recurring Nature and Frequency of Government Shutdowns*. ............ 6

     3.     *Government Shutdowns Repeatedly Shut Down the COLA Process*. ........... 8

     4.     *Atlas Brew Works*...................................................... 8

     5.     *Atlas's Perpetual Need for COLAs*....................................... 9

     6.     *Atlas's Recurring Injuries Owing to the Repeated Shutdowns of the COLA Process*................................................ 10

Summary of Argument..................................................... 14

Argument................................................................ 15

I.     The Government Fails to Carry Its Heavy Burden in Establishing Mootness........... 15

     A.     Atlas Has Not Received All the Relief It Sought........................... 15

     B.     Intervening Legislation Did Not Address the Declaratory Judgment Claim....... 16

     C.     Atlas Did Not Only Challenge an Event. It Challenges a Policy................ 17

II.     Even if the Case Is Moot, Atlas's Injuries Are Capable of Repetition While Evading Review....................................................... 19

     A.     Shutdown Injuries Evade Review, Because They Evade Supreme Court Review. . 19

     B.     There Is More than a Reasonable Expectation that Atlas Will Be Subjected to the Same Legal Wrong............................................. 20

1.      "Controversy". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

2.      "Capable of Repetition". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

III.    Prudential Concerns Support Accepting, Not Rejecting, Jurisdiction. . . . . . . . . . . . . . . . 27

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

TABLE OF AUTHORITIES

Cases

*AFGE* v. *Rivlin*,
  995 F. Supp. 165 (D.D.C. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Better Government Ass'n* v. *Dep't of State*,
  780 F.2d 86 (D.C. Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Biggs* v. *Wilson*,
  1 F.3d 1537 (9th Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Biggs* v. *Wilson*,
  828 F. Supp. 774 (E.D. Cal. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Chamber of Commerce of U.S.* v. *U.S. Dep't of Energy*,
  627 F.2d 289 (D.C. Cir. 1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*City of Houston* v. *Department of Hous. & Urban Dev.*,
  24 F.3d 1421 (D.C. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

*Coalition for Econ. Survival* v. *Deukmejian*,
  171 Cal. App. 3d 954 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Covelo Indian Community* v. *Watt*,
  551 F. Supp. 366 (D.D.C. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Del Monte Fresh Produce Co.* v. *United States*,
  570 F.3d 316 (D.C. Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18-20

*FEC* v. *Wis. Right to Life, Inc.*,
  551 U.S. 449 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

*Foster* v. *Carson*,
  347 F.3d 742 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Friends of the Earth, Inc.* v. *Laidlaw Envtl. Servs. (TOC), Inc.*,
  528 U.S. 167 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Global Tel*Link* v. *FCC*,
  866 F.3d 397 (D.C. Cir. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Hewitt* v. *Helms*,
  482 U.S. 755 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

iii

*Honeywell Int'l* v. *NRC*,
  628 F.3d 568 (D.C. Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 21

*Judicial Watch, Inc.* v. *United States Dep't of Homeland Sec.*,
  895 F.3d 770 (D.C. Cir. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Kifafi* v. *Hilton Hotels Ret. Plan*,
  701 F.3d 718 (D.C. Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*LaShawn A.* v. *Barry*,
  144 F.3d 847 (D.C. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Leonard v. United States DOD*,
  38 F. Supp. 3d 99 (D.D.C. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26

*Libertarian Nat'l Comm., Inc.* v. *FEC*,
  317 F. Supp. 3d 202 (D.D.C. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Libertarian Nat'l Comm., Inc.* v. *FEC*,
  930 F. Supp. 2d 154 (D.D.C. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Marbury* v. *Madison*,
  5 U.S. (1 Cranch.) 137 (1802) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Nat'l Treasury Employees Union* v. *United States*,
  D.D.C. No. 19-CV-50 (Jan. 31, 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Nat'l Wildlife Fed'n* v. *United States*,
  626 F.2d 917 (D.C. Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Pratt* v. *Wilson*,
  770 F. Supp. 539 (E.D. Cal. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 27

*Reid* v. *Inch*,
  914 F.3d 670 (D.C. Cir. 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*True the Vote, Inc.* v. *IRS*,
  831 F.3d 551 (D.C. Cir. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*United Bhd. of Carpenters & Joiners of Am.* v. *Operative Plasterers
  & Cement Masons' Int'l Ass'n of the United States*,
  721 F.3d 678 (D.C. Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

iv

*United States ex rel. Oliver* v. *Philip Morris USA Inc.*,
    826 F.3d 466 (D.C. Cir. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*United States Telecom Ass'n* v. *FCC*,
    825 F.3d 674 (D.C. Cir. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*United States* v. *Concentrated Phosphate Export Ass'n*,
    393 U.S. 199 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25


Constitutional Provisions

U.S. Const. art. I, § 9, cl. 7. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6


Statues and Rules

2 U.S.C. § 601 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

27 C.F.R. Part 7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

27 C.F.R. § 7.41(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 12, 13

27 U.S.C. § 201 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

27 U.S.C. § 205(e). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5, 12, 13

27 U.S.C. § 207 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 12, 13

28 U.S.C. § 2201(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

31 U.S.C. § 1341.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

52 U.S.C. § 30110.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29


Other Authorities

List of earthquakes in California, available at https://en.wikipedia.org/wiki
    /List_of_earthquakes_in_California (last visited March 14, 2019). . . . . . . . . . . . . . . . . . 22

Robert C. Lehrman, *TTB Shutdown?*, Bevlog, Sept. 30, 2013 (as updated),
    available at https://bevlaw.com/bevlog/ttb-shutdown/ (last visited
    March 12, 2019). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Robert Holmes, Jr., *The 100-Year Flood—It's All About Chance (USGS)*, USGS,
    available at https://water.usgs.gov/edu/100yearflood-basic.html
    (last visited March 14, 2019). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Ruth Simon, *Where Did All the Craft Beer Go? Government Shutdown
    Closes Tap on New Brews*, Wall Street Journal, Jan. 11, 2019 . . . . . . . . . . . . . . . . . . . . . . 5

Suggestion of Mootness, *Libertarian Nat'l Comm.* v. *FEC*,
    D.C. Cir. No. 13-5088 (Feb. 3, 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Sylvan Lane, *Mnuchin asks Congress to raise debt ceiling 'as soon as possible*,
    The Hill, March 5, 2019, available at https://thehill.com/policy/finance/
    432657- mnuchin-asks-congress-to-raise-debt-ceiling- as-soon-as-possible. . . . . . . . . . . . . 7

Tim Mak, *Meet the Beer Bottle Dictator*, The Daily Beast, Aug. 12, 2014,
    available at https://www.thedailybeast.com/meet-the-beer-bottle-dictator
    (last visited Jan. 12, 2019). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

TTB Ruling 2013-1 (Mar. 27, 2013),
    available at https://www.ttb.gov rulings/2013-1.pdf. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

INTRODUCTION

The government's latest motion to dismiss again fails to address the merits of Atlas Brew

Works's claim. The reason is clear enough: there is no defense. Equally clear, this Court retains

jurisdiction. The government has simply not carried its heavy mootness burden. Nor can it escape

the fact that the case, even were it moot, is one "capable of repetition, yet evading review."

Government shutdowns happen. Since the 1976 advent of the current federal budget process,

Congress has enacted a timely budget only four times, and appropriations for governmental

functions have repeatedly lapsed—sometime multiple times a year, twenty-one (21) times in all, an

average of one funding gap approximately every two years. Those funding gaps are now better

understood to require shutdowns, which occur with increasing regularity. And appropriation lapses

are not the only budget events that threaten government shutdowns. Barring agreement between

Congress and the President, another shutdown will occur in about six months when the federal

government's debt ceiling is reached, and the government's deficit spending becomes impossible.

As the government aptly shows, many of the small handful of shutdown cases to have arisen

over the years were deemed moot upon the shutdown's end, as they arose from isolated incidents

whose likelihood of repetition was largely speculative. But the government's survey is incomplete.

At least two district courts, and one circuit court, *have* awarded post-shutdown declaratory relief.

Their examples should be followed here.

And here, repetition is hardly speculative. The Treasury Department's Alcohol and Tobacco

Tax Trade Bureau ("TTB") maintains a shutdown script—a script it has already *twice* followed just

in the past six years. When the government shuts down, TTB stops issuing Certificates of Label

Approval ("COLAs"). And when TTB stops issuing COLAs, Atlas cannot publish any new labels in

interstate commerce. Not only is Atlas then forbidden from expressing itself. The brewer is also barred from selling its products, and its business is thrown into disarray as production and sales cannot be scheduled.

Not that a mere promise of voluntary cessation would do, but the government's motion does not even hint at revisiting the challenged practice of enforcing the COLA requirement when COLAs are unavailable. Atlas has simply not obtained all the relief it seeks. The government thus fails to carry its heavy burden in establishing mootness.

Even were the government to carry its heavy mootness burden, the Court would still retain jurisdiction. The government guarantees, in writing, that the COLA function must shut down during funding lapses, and such shutdowns are all-but guaranteed to impact Atlas because Atlas is in perpetual need of COLAs. Last year the brewer applied for 33 COLAs—an average of one COLA application every 11.04 days. The injury Atlas sustained here for 35 days—the silencing of its protected speech on account of a shutdown—is thus not merely *capable* of repetition. Shutdowns have twice shuttered the COLA process in Atlas's short history. Nobody seriously believes that shutdowns are a thing of the past, and future COLA shutdowns are confirmed in written policy.

Of course the shutdowns, while persistent and painfully long for all impacted, tend not to run long enough (yet) to allow for full Supreme Court review of their consequences. This case thus supplies the classic example of an injury that is "capable of repetition, yet evading review." This Court would not turn from its Article III duty to address a continuing First Amendment violation. It should not decline to review a written policy of inflicting intermittent First Amendment violations.

And if the government can maintain a written a policy of closing the COLA function during funding lapses, this Court can most certainly issue a declaratory judgment spelling out the First Amendment consequences of that policy. The motion to dismiss should be denied.

2

STANDARD OF REVIEW

"For purposes of a motion to dismiss, the facts alleged in the Complaint are taken to be true, and all inferences are drawn in [the plaintiff's] favor." *United States ex rel. Oliver* v. *Philip Morris USA Inc.*, 826 F.3d 466, 469 n.2 (D.C. Cir. 2016) (citation omitted). And as the government notes, "it is well-settled that this Court may consider materials outside of the pleadings to determine whether it has subject matter jurisdiction over the claims." Motion at 7 (citations omitted).

The government's statement of the standard of review is otherwise incomplete. It is true that the plaintiff bears the burden of establishing standing at the time the suit is brought. But "[t]he initial 'heavy burden' of establishing mootness lies with the party asserting a case is moot," while "the opposing party bears the burden of showing an exception applies." *Honeywell Int'l* v. *NRC*, 628 F.3d 568, 576 (D.C. Cir. 2010) (citations omitted).

Mootness must be complete. "[A] heavy burden of establishing mootness is not carried by proving that the case is *nearly* moot." *True the Vote, Inc.* v. *IRS*, 831 F.3d 551, 561 (D.C. Cir. 2016) (emphasis added).

STATEMENT OF FACTS[1]

1.      *The Prior Restraint on Beer Label Speech*

The Federal Alcohol Administration Act, 27 U.S.C. § 201 et seq. ("the FAA Act") regulates the content of alcoholic beverage labels shipped in interstate commerce, requiring and forbidding various types of speech that such labels might convey. The FAA Act provides that "[i]t shall be unlawful for any person engaged in business as a . . . brewer . . . [t]o sell or ship or deliver for sale or shipment, or otherwise introduce in interstate or foreign commerce . . . any . . . malt beverages in

---

[1]Although some of this may be familiar to the Court, Atlas presents a full accounting of the now-relevant facts for ease of reference.

3

bottles, unless such products are bottled, packaged, and labeled in conformity with such regulations, to be prescribed by the Secretary of the Treasury, with respect to packaging, marking, branding, and labeling and size and fill of container . . . ." 27 U.S.C. § 205(e).

The Treasury Secretary's regulations must prohibit various false, misleading, obscene, or misleading statements, and the disparagement of competitors' products; and require the disclosure of the beer's identity and quality, the net contents of the container, and the identity of the beer's manufacturer. 27 U.S.C. § 205(e). This, they do. *See* 27 C.F.R. Part 7.

To ensure compliance with federal beer label content standards, the FAA Act subjects all beer labels to a prior restraint, known as a "COLA":

> In order to prevent the sale or shipment or other introduction of . . . malt beverages in interstate or foreign commerce, if bottled, packaged, or labeled in violation of the requirements of this subsection . . . no brewer or wholesaler of malt beverages shall bottle . . . for sale or any other commercial purpose . . . malt beverages . . . unless, upon application to the Secretary of the Treasury, he has obtained and has in his possession a certificate of label approval ["COLA"] covering the . . . malt beverages, issued by the Secretary in such manner and form as he shall by regulations prescribe: *Provided*, That any such . . . brewer or wholesaler of malt beverages shall be exempt from the requirements of this subsection if, upon application to the Secretary, he shows to the satisfaction of the Secretary that the . . . malt beverages to be bottled by the applicant are not to be sold, or offered for sale, or shipped or delivered for shipment, or otherwise introduced, in interstate or foreign commerce.

27 U.S.C. § 205(e). A Treasury regulation likewise provides that "[n]o person may bottle or pack malt beverages, or remove malt beverages from the plant where bottled or packed unless an approved certificate of label approval, TTB Form 5100.31, is issued." 27 C.F.R. § 7.41(a). But brewers need no longer seek exemptions from the label approval requirement when selling beer intrastate. *See* TTB Ruling 2013-1 (Mar. 27, 2013), available at https://www.ttb.gov/rulings/2013-1.pdf

The TTB administers the COLA requirement. In plaintiff's experience, COLA applications for beer are typically processed within three weeks, First Am. Complaint ("FAC") ¶¶ 10, 16; Cox

Decl., 3/14/19, ¶ 12,[2] although TTB might claim that it "normally takes less than a week to approve

new labels for beer and other malt beverages." Ruth Simon, *Where Did All the Craft Beer Go?*

*Government Shutdown Closes Tap on New Brews*, Wall Street Journal, Jan. 11, 2019.

In any event, the TTB is no rubber stamp. Under the leadership of its preceding Malt

Beverage Labeling Specialist, Kent Battle Martin, the agency gained notoriety for aggressively

policing the content of every beer label used in the United States.

> Battle has rejected a beer label for the King of Hearts, which had a playing card image on it, because the heart implied that the beer would have a health benefit.

> He rejected a beer label featuring a painting called The Conversion of Paula By Saint Jerome because its name, St. Paula's Liquid Wisdom, contained a medical claim—that the beer would grant wisdom.

> He rejected a beer called Pickled Santa because Santa's eyes were too "googly" on the label, and labels cannot advertise the physical effects of alcohol. (A less googly-eyed Santa was later approved.)

> He rejected a beer called Bad Elf because it featured an "Elf Warning," suggesting that elves not operate toy-making machinery while drinking the ale. The label was not approved on the grounds that the warning was confusing to consumers.

> He rejected a Danish beer label that featured a hamburger, which was turned down because the image implied there was a meat additive in the beer.

Tim Mak, *Meet the Beer Bottle Dictator*, The Daily Beast, Aug. 12, 2014, available at

https://www.thedailybeast.com/meet-the-beer-bottle-dictator (last visited Jan. 12, 2019).

The Attorney General may bring an action in the relevant United States District Court "to

prevent and restrain violations of" the FAA Act. Shipping beer in interstate commerce without a

COLA, in violation of 27 U.S.C. § 205(e), is a misdemeanor punishable by a fine of up to $1,000

per offense, although the Treasury Secretary is authorized to settle for half. 27 U.S.C. § 207.

---

[2]All citations to Justin Cox's declaration are to the declaration filed contemporaneously with this brief.

2.      *The Recurring Nature and Frequency of Government Shutdowns*

The modern federal budgeting process was created by the Congressional Budget and

Impoundment Control Act of 1974, 2 U.S.C. § 601 et seq. Under this act, "[t]he routine activities of

most federal agencies are funded annually by one or more of the regular appropriations acts." Exh.

B, Congressional Research Service, *Federal Funding Gaps: A Brief Overview*, at 1; FAC ¶ 18.

Timely budgets are the very rare exception, not the rule. Since the modern budget process

began with Fiscal Year 1977, "all of the regular appropriations acts have been enacted by the

beginning of the fiscal year in only four instances." FAC ¶19, Exh. B at 1.

When, as is usually the case, one or more of these acts are not timely enacted, a "continuing

resolution" ("CR") may supply interim funding. *Id*. But often enough, funding for at least some

government functions lapses. The federal government cannot spend money absent Congressional

appropriation. U.S. Const. art. I, § 9, cl. 7. Where funding expires and "does not resume in time to

continue government operations, then, under the Antideficiency Act [31 U.S.C. § 1341, et seq.], an

agency must cease operations, except in certain situations when law authorizes continued activity."

FAC ¶ 20; Exh. C, Congressional Research Service, *Shutdown of the Federal Government:*

*Causes, Processes, and Effects*, Summary p. 1. "[E]xecutive agencies begin a shutdown of the

affected projects and activities, including the furlough of non-excepted personnel." FAC ¶ 20; Exh.

B at 2.

In the modern budget era, funding lapses have occurred no fewer than twenty-one (21) times.

FAC ¶ 21; Exh. B at 3 (listing twenty funding lapses); Exh. C at 4 & n.20 (recounting "short-

technical lapse" of Feb. 8-9, 2018) (citations omitted). "Multiple funding gaps have occurred during

a single fiscal year in four instances." FAC ¶ 21; Exh. B at 2. Occasionally, a funding lapse falls on

a weekend, or is terminated by a CR before the impacted agencies can complete the process of

shutting down. FAC ¶ 20; Exh. B at 4. And under a previous understanding of the Antideficiency

Act, "the expectation was that agencies would not shut down during a funding gap." *Id.*

But funding gaps have trended toward more severe shutdowns. "The most recent funding

gaps—two in FY1996, one in FY2014, one in FY2018, and one in FY2019—all resulted in

widespread cessation of non-excepted activities and furlough of associated personnel." FAC ¶ 22;

Exh. B at 5. Fiscal year 1996 saw severe shutdowns lasting 5 and 21 days, respectively. FAC ¶ 22;

Exh. B at 5-7. Fiscal year 2014 saw a 16 day government shutdown, and of course, the current fiscal

year saw a shutdown last 34 full days. FAC ¶ 22; Exh. B at 7-8. This last shutdown was one of three

in the current presidential term alone, although fortuitously the previous two coincided with a

weekend and occurred overnight, respectively. FAC ¶ 22; Exh. B at 8; Exh. C at 4 & n.20.

Funding lapses are not the only potential cause of government shutdowns. As everyone

knows, the federal government is operating at a deficit. But the government's ability to borrow

money to finance its operations is not unlimited. FAC ¶ 23; *see generally* Exh. D, Congressional

Budget Office, *Federal Debt and the Statutory Limit, February 2019*, available at https://

www.cbo.gov/publication/54987. The debt ceiling was reimposed earlier this month, and the

Treasury Department is undertaking "extraordinary measures" to manage its cash flow in such a

way as to avoid hitting that limit. Sylvan Lane, *Mnuchin asks Congress to raise debt ceiling 'as

soon as possible*, The Hill, March 5, 2019, available at https://thehill.com/policy/finance/432657

-mnuchin-asks-congress-to-raise-debt-ceiling- as-soon-as-possible. The Congressional Budget Office

estimates that absent a debt limit increase, Treasury "will probably have sufficient cash to make its

usual payments until late in the fiscal year, although an earlier or later date is possible," Exh. D at

4—meaning, that if Congress and the President do not agree on a debt bill around October 1, 2019,

the government's ordinary operation would be impossible, as the country would experience "delays

of payments for government activities, a default on the government's debt obligations, or both." *Id.*
As CRS puts it, a debt limit impasse may lead to "disruptions in government operations." Exh. C at
8 Box 2.

3.      *Government Shutdowns Repeatedly Shut Down the COLA Process*

The Antideficiency Act contains some "exceptions" from its prohibition of governmental
functions during appropriation lapses. Agencies may designate which of its functions fall under such
exceptions. FAC ¶ 24; *see generally* Exh. C at 5-7. Twice in the last six years, the Treasury
Department has designated its COLA function as "non-excepted." FAC ¶ 24; *see* Exh. E, TTB
Shutdown Plan, September 2013, at 2-3; Exh. F, TTB Shutdown Plan, December 6, 2017.

And twice in the last six years, per that designation, TTB shuttered its COLA function
during prolonged funding gaps. When funding ran out September 30, 2013, TTB shut down the
COLA process by 9:30 a.m. on October 1, 2013, and kept the process shut until October 17, 2013.
FAC ¶ 25; Robert C. Lehrman, *TTB Shutdown?*, Bevlog, Sept. 30, 2013 (as updated), available at
https://bevlaw.com/bevlog/ttb-shutdown/ (last visited March 12, 2019); *see also* Exh. G.

When funding ran out December 22, 2018, TTB shut down the COLA process immediately,
and kept the process shut until funding was restored January 25, 2019. FAC ¶¶ 26, 27; Cox Decl. ¶
16; Scalese Decl., 2/27/19, ¶ 2; *see also* Exh. H.

4.      *Atlas Brew Works*

From its solar-powered brewery in Northeast Washington's Ivy City neighborhood, Atlas
Brew Works LLC ("Atlas") ships approximately 60,000 cases of craft beer per year, to be enjoyed
in and beyond the city's borders. Like most craft brewers, Atlas brews a selection of beers typically
available year-round, such as DISTRICT COMMON Craft Lager and PONZI American IPA, and a
collection of seasonal beers, including NSFW Double Black IPA and FESTBIER German-style Lager.

Atlas's beers contain no preservatives, and are best enjoyed fresh. Atlas distributes approximately 60% of its beer in kegs, and approximately 40% of its beer in cans. Occasionally, Atlas releases some beer in bottles. Atlas has begun hiring contractors to brew additional quantities of its beers at other locations. FAC ¶ 1; Cox Decl. ¶ 2.

Speech is essential to Atlas Brew Works. Like all beverage producers, Atlas Brew Works must label the containers of its products that it wishes to distribute. It cannot sell, and no one will purchase, random unidentified liquids. And so, Atlas Brew Works expresses itself through the labels it places on cans and kegs containing its beers. Its labels communicate essential information to consumers, such as a beer's brand name, the style and type of beer, a beer's ingredients, its origin, alcohol content, and important safety information. Cox Decl. ¶ 3. Atlas's beer labels also contain other useful information, such as suggested food pairings and Atlas's web address where individuals may read more messages from Atlas. And by its choice of font, color, artwork, and other design elements of its beer labels, Atlas Brew Works seeks to enhance consumers' enjoyment of its product and convey and further the Atlas brand. Cox Decl. ¶ 4; FAC ¶¶ 5, 6.

   5.   *Atlas's Perpetual Need for COLAs.*

Atlas was founded May 1, 2012. It sold its first beer to a distributor in August, 2013, and had its market release September 3, 2013. Atlas has obtained 80 COLAs for its various cans, kegs, and bottles since its founding. Only two of Atlas's COLA applications were rejected (for use of the word "pumpernickel," which TTB asserted was not an ingredient). One application is currently outstanding. FAC ¶ 12; Cox Decl. ¶ 6. Exhibit A is list of these COLA applications.

COLAs were less important to Atlas in its early years, as it did not start distributing beer outside the District of Columbia until March, 2015. Accordingly, the government shutdown of September 30-October 17, 2013, which shuttered the TTB's COLA processing function barely a

9

month after Atlas began selling its first product in Washington, D.C., did not impact Atlas. Cox Decl. ¶ 7. But Atlas never intended to confine its sales to the District of Columbia. It is impossible to foresee Atlas abandoning its substantial interstate market, which Atlas intends to continue growing. Cox Decl. ¶ 8; FAC ¶ 13.

Atlas's need for COLAs has increased as the business has grown, and proliferated into brewing more types of beer, and at different locations. Excluding one withdrawn surplus application, Atlas applied for 33 COLAs in 2018, or one COLA approximately every 11 days, of which all but one were eventually issued either as applied or following some discussion with TTB. Atlas has already applied for five COLAs thus far in 2019, and expects that the number of COLAs sought and obtained this year will approach or exceed the same number of COLAs sought and obtained last year. FAC ¶ _; Cox Decl. ¶ 9. Most recently, on March 12, 2019, Atlas applied for a COLA for Hop Bot, a Pale Ale that Atlas plans to release in conjunction with "Awesome Con," Washington, D.C.'s comics convention slated to be held April 26-28, 2019. That COLA has not yet been approved. FAC ¶ 14; Cox Decl. ¶ 10.

6. *Atlas's Recurring Injuries Owing to the Repeated Shutdowns of the COLA Process*

Atlas, like other brewers, loses money if production facilities are idle, or if fresh product is not delivered and sold to consumers in a timely fashion. Atlas must schedule, in advance, the purchase of its ingredients, the production of its beer at its facilities or those of its contractors, and the timely delivery of finished product to distributors and retail outlets. FAC ¶ 15; Cox Decl. ¶ 11. Atlas also must schedule any necessary design work for, and production of, its cans and other labels. In planning new beers, Atlas builds in eight weeks for can label design, three weeks for TTB approval, and six weeks for the production of cans. The design process for bottle labels is the same as for can labels, although the printing of bottle labels takes only two weeks. Atlas's keg collars take

10

much less time to generate, as it has an established format for keg collars. FAC ¶ 16; Cox Decl. ¶ 12.

Because COLAs are essential to the sale of beer in interstate commerce, Atlas, like other brewers, factors a certain amount of time for COLA approval into the process. Any inordinate delay in obtaining a COLA can threaten Atlas's business, as Atlas may be left with beer it cannot sell, leaving thirsty consumers and lost market share while production facilities needed to make new beer are occupied. Apart from the recent government shutdown, delays in the COLA process have not jeopardized Atlas's operations. FAC ¶ 17; Cox Decl. ¶ 13.

On January 3, 2019, Atlas began brewing the first 40 of 100 planned barrels of THE PRECIOUS ONE, a seasonal, apricot-infused India pale ale that it intended to sell between February and April, 2019. Of the initial 40 barrel batch of THE PRECIOUS ONE, Atlas planned to fill 7,200 cans and approximately 40 kegs. It intended to retain four of these kegs for its tap room. Half the remaining kegs would be distributed elsewhere within the District of Columbia, and the other half were planned for distribution to Atlas's five out-of-state distributors in Maryland, Virginia, and Tennessee. FAC ¶ 30; Cox Decl. ¶ 14.

On January 9, 2019, Atlas completed production of THE SHAPE OF FUNK TO COME, a Flanders red ale, and packed 9 kegs of that beer, of which 5 were destined and ready for sale in the interstate market. Atlas packed another 14 kegs of SHAPE on January 28, of which 5 were planned for interstate sale. FAC ¶ 31; Cox Decl. ¶ 15.

On November 28, 2018, Atlas applied for a COLA for cans of THE PRECIOUS ONE. On December 17, 2018, the TTB approved this application. On December 20, 2018, Atlas applied for four COLAs, including for the label to be applied to kegs of THE PRECIOUS ONE. On December 22, 2018, TTB shuttered its COLA process for lack of funding, without having taken any action on

Atlas's pending COLA applications, including the COLA application for THE PRECIOUS ONE keg label. On January 3, 2019, Atlas applied for a keg collar COLA for THE SHAPE OF FUNK TO COME. But the COLA process would not reopen until after funding was restored January 25, 2019. FAC ¶¶ 27, 29, 31 ; Cox Decl. ¶ 16.

Atlas is aware that the government enforces the FAA Act and its COLA requirement. It refrained from causing THE PRECIOUS ONE and THE SHAPE OF FUNK TO COME kegs to be labeled in interstate commerce because it feared that doing so would subject it, its employees, and officers to prosecution under 27 U.S.C. § 207 for violating the COLA requirement of 27 U.S.C. § 205(e) and 27 C.F.R. § 7.41(a). Atlas refrained from publishing other new beer labels indefinitely for the same reason. FAC ¶ 32; Cox Decl. ¶ 17.

The TTB's funding lapse, and the implementation of its policy to respond to that lapse by shuttering the COLA process, significantly hurt Atlas and its customers. For weeks, Atlas refrained from labeling and placing kegs of THE PRECIOUS ONE in interstate commerce because it lacked a Certificate Of Label Approval for any label that it would place on THE PRECIOUS ONE kegs. Atlas was censored. It was unable to express itself as it wished, and its customers were unable to receive Atlas's speech. The shutdown also extended beyond the normal processing time for THE SHAPE OF FUNK TO COME's COLA. Accordingly, the delivery of that beer, and the publication of its label, was also delayed on account of the shutdown. FAC ¶ 33; Cox Decl. ¶ 18.

The censorship also disrupted Atlas's ability to plan its business. THE PRECIOUS ONE is perishable after 120 days, and seasonal. Atlas could not retain THE PRECIOUS ONE in its fermenting tank indefinitely, as it needed to have the tank vacated of THE PRECIOUS ONE to make room for the production of additional beer. Atlas did not believe it could realistically sell all of THE PRECIOUS ONE intended for interstate keg delivery by other means. A similar problem affected Atlas with

12

respect to THE SHAPE OF THINGS TO COME, as that beer's production was completed during the

shutdown while its keg collar COLA application languished. Atlas refrained from entering into a

contract with Beltway Brewing, for the brewing of THE 1500 SOUTH CAP lager, because no COLA

was available for the distribution of that beer with a Virginia origin. And Atlas was threatened with

the loss of interstate sales of its summer seasonal, NINJA SAUCE, for which it had no COLA. FAC ¶

34; Cox Decl. ¶ 19.

Atlas estimated that its losses from being unable to sell THE PRECIOUS ONE kegs in interstate

commerce would be $5,000 for the current 40 barrel batch, and $15,000 for the total planned 100

barrel production run. These losses were projected to multiply greatly, threatening Atlas's continued

existence, as the COLA prohibition effectively shut down further production of new beers and the

rebranding of existing beers. The projected lost sales of THE PRECIOUS ONE were not hypothetical.

Since having obtained the keg collar COLA for THE PRECIOUS ONE on January 29, 2019, Atlas has

sold 32 barrels of that beer in kegs to out-of-state distributors. FAC ¶ 35; Cox Decl. ¶ 20.

Atlas intends to remain in business, which means, it intends to continue applying for and

obtaining COLAs. Atlas requires the continued provision of COLAs to continue speaking as it

wishes, and to remain in business. But although Atlas is in perpetual need of COLA approval, it will

not subject itself, its officers or employees to prosecution under 27 U.S.C. § 207 for violating the

COLA requirement of 27 U.S.C. § 205(e) and 27 C.F.R. § 7.41(a). The next shutdown of the

TTB's COLA process will therefore again silence Atlas's speech and imperil its business, unless this

Court declares that prosecuting Atlas for publishing without a COLA, when COLAs become

unavailable, violates Atlas's First Amendment rights and the rights of its customers. FAC ¶ 36; Cox

Decl. ¶ 21.

13

SUMMARY OF ARGUMENT

The government does not carry its burden in establishing mootness, because none of its mootness theories defeat the fact that this Court's decision on the merits will likely impact the parties in the future. It is simply untrue that Atlas has received all the relief it has sought. Atlas's claim for declaratory relief remains outstanding. Nor did the restoration of funding for COLA issuance have any impact on the challenged policy of enforcing COLAs when they are unavailable. Nor can mootness with respect to the injuries sustained in the most recent shutdown moot Atlas's existing policy challenge.

Even if the government could establish mootness, it misstates the law as to the exception for cases that are "capable of repetition, yet evading review." "Evading review" means evading *Supreme Court* review. The D.C. Circuit holds that any agency action lasting under two years is presumptively one that "evades review." Thankfully, none of the 21 funding lapses that have occurred, on average, every two years in this country in the modern budget era have *ever* lasted over two years. The government's theory that the injury here does not evade review, because this court might have reached it, contradicts both precedent and illogical.

And the notion that the circumstances are not *capable* of repeating, because the government *might* change its policy, is specious, as is each car in the government's long train of absurd conjecture. Wild speculation is not a substitute for hard facts and mathematical reality.

Finally, the government's alleged prudential concerns are way off the mark. As this Court has already had some time to consider Atlas's First Amendment claims, it is well-positioned to assess whether Atlas's claims—that beer labels are protected speech, that prior restraints must be defined in time—are truly radical propositions, or exceptionally well-settled concepts. And nothing in this case asks the Court to decide budget issues or to otherwise intervene in any political dispute.

14

ARGUMENT

I.   THE GOVERNMENT FAILS TO CARRY ITS HEAVY BURDEN IN ESTABLISHING MOOTNESS.

In assessing the prospect of mootness, a court must ask whether its decision would "have a more-than-speculative chance of affecting [the parties] in the future." *Kifafi* v. *Hilton Hotels Ret. Plan*, 701 F.3d 718, 724 (D.C. Cir. 2012). "The real value of the judicial pronouncement -- what makes it a proper judicial resolution of a 'case or controversy' rather than an advisory opinion -- is in the settling of some dispute *which affects the behavior of the defendant towards the plaintiff*." *Hewitt* v. *Helms*, 482 U.S. 755, 761 (1987).

Holding that Atlas cannot be required to obtain an unavailable COLA will certainly impact the Attorney General's thinking when the government next shuts down and Atlas publishes a beer label. It would definitely impact the parties' relationship if the government sought enforcement under such circumstances. Perhaps more likely, a decision might impact the parties' relationship owing to its impact on Congress, and on TTB, in being forced to confront the issue. Congress and the TTB could each respond to a declaratory judgment by ensuring that COLAs are either unimpacted by funding lapses, or not required when lapses occur.

Nonetheless, the government offers three mootness theories. None carry its heavy burden.

A.   Atlas Has Not Received All the Relief It Sought.

The government's claim that Atlas "has obtained the full scope of its requested relief sought in its Complaint, and therefore this lawsuit is moot," Motion at 8, is belied by the original complaint's plain text. In both of its counts, Atlas declared that it "is entitled to *declaratory and injunctive relief*." Complaint, Dkt. 1, at 8 ¶¶ 23, 26 (emphasis added). The Complaint's prayer for relief sought not only injunctive relief, *id*. at 9 ¶¶ 1, 2, but separately, declaratory relief, *id*. ¶ 3. The First Amended Complaint continues these demands.

15

It is thus simply untrue that Atlas "has now obtained the full scope of relief sought in the

Complaint," which the government misdescribes as the granting of the various COLA applications

pending during the most recent shutdown. Motion at 10. Atlas never sought a mandatory injunction

for the COLAs' issuance. The COLAs did provide Atlas with some of the relief it requested—the

ability to publish several urgently-needed labels. But they did not come close to approximating the

declaratory relief that Atlas sought, and still seeks. Only "a court of the United States," not the TTB,

may enter a declaratory judgment. 28 U.S.C. § 2201(a).

B.      Intervening Legislation Did Not Address the Declaratory Judgment Claim.

The government spends much effort describing how, "in the context of a facial challenge that

seeks to have a statute 'declared unconstitutional and enjoined,' a matter will be rendered moot"

when the offending statute is legislatively altered to undo the alleged harm. Motion at 9 (collecting

cases).

The theory is correct as far as it goes, which is not too far here because this case involves no

facial challenge. As the government concedes, "[t]he Complaint specifie[d] that Plaintiff 'raises no

challenge to the COLA process itself, or to any of the standards the government would apply in

licensing beer labels.'" Motion at 4 (quoting Complaint, Dkt. 1, at 2). The government could have

also mentioned that Atlas did "not seek a mandatory injunction to reopen the COLA function," or

"the redirection or appropriation of any federal funds." Complaint, Dkt. 1, at 2.

Rather, the challenge was to the Attorney General's practice of enforcing the COLA

requirement when COLAs are unavailable. Had legislation undone the TTB's policy of shuttering

the COLA function during funding lapses, by either creating a permanent appropriation for COLAs,

or underscoring that the need to issue COLAs is inherent in the delegated function, or perhaps

providing that the COLA function is an excepted activity necessary to the protection of life or

16

property; or had legislation de-funded the Justice Department's COLA enforcement during appropriation gaps, *then* the government's legislative mootness argument would have merit. But Congress did not enact legislation doing any of these things, or otherwise undoing *the challenged practice*. Nothing in the recent appropriation suggests that this scenario would not repeat itself in the next shutdown. Just as the appropriation that ended the last COLA shutdown, only six years ago, did not prevent this most recent COLA shutdown.

C.      Atlas Did Not Only Challenge an Event. It Challenges a Policy.

The government at times appears to argue that the case is moot because the changed circumstances that obviated Atlas's request for injunctive relief automatically establish mootness as to the declaratory judgment claim. This might be a plausible claim, if Atlas merely challenged the constitutionality of an isolated event. But that is not the case. Atlas's injury was a consequence of a challenged *policy*—the enforcement of the COLA prior restraint notwithstanding the government's inability to issue COLAs. Policy claims are not mooted by the end of an isolated injury.

Atlas never limited its theory of the case to the particular facts of the injuries as they existed at the time of the complaint's filing. The initial complaint opened, "The First Amendment *never* shuts down. *Always* essential, it remains in effect regardless of what Congress may or may not decide with respect to the federal budget." Complaint, Dkt. 1, at 1 (emphasis added); *see also id.* at 2 ("[Atlas] cannot be denied the right to speak for lack of meeting an impossible condition."). On a motion to dismiss, Atlas is entitled to having any ambiguity on the subject resolved in its favor. In any event, Atlas has amended its complaint to clarify this point. *See* FAC ¶ _.

The D.C. Circuit recognizes the mootness distinction as between challenges to actions, and challenges to policies. "It is well-established that if a plaintiff challenges both a specific agency action and the *policy* that underlies that action, the challenge to the policy is not necessarily mooted

merely because the challenge to the particular agency action is moot." *City of Houston* v. *Department of Hous. & Urban Dev.*, 24 F.3d 1421, 1428 (D.C. Cir. 1994) (citations omitted). "[A] plaintiff's challenge will not be moot where it seeks declaratory relief as to an ongoing policy." *Del Monte Fresh Produce Co.* v. *United States*, 570 F.3d 316, 321 (D.C. Cir. 2009) (citing *Houston*, 24 F.3d at 1429). "[I]f a plaintiff's allegations go not only to a specific agency action, but to an ongoing policy as well, and the plaintiff has standing to challenge the future implementation of that policy, then declaratory relief may be granted if the claim is ripe for review." *Houston*, 24 F.3d at 1430.

The example of this doctrine that the D.C. Circuit supplied just this past summer is instructive. In *Judicial Watch, Inc.* v. *United States Dep't of Homeland Sec.*, 895 F.3d 770 (D.C. Cir. 2018), an organization in the habit making FOIA requests successfully challenged an alleged policy of unreasonably withholding information under that act. Although "FOIA lawsuits generally become moot once an agency has made available requested non-exempt records . . . [t]his court has recognized an exception to mootness where an agency has a 'policy or practice' that 'will impair the party's lawful access to information in the future.'" *Id.* at 777 (citations omitted). The Court understands that such claims are not abstract. Ordering the government to conduct itself a certain way on the next occurrence of a past circumstance is well within the Court's Article III power.

The doctrine applies here. Atlas has standing not only because it is a frequent COLA applicant, meaning the challenged policy applies to it, but also because in the First Amendment context, it can rely upon "a conventional background expectation that the government will enforce the law." *United States Telecom Ass'n* v. *FCC*, 825 F.3d 674, 739 (D.C. Cir. 2016) (internal quotation marks omitted). And the claim is ripe, as "the disputed claims raise purely legal questions and would, therefore, be presumptively suitable for judicial review." *Houston*, 24 F.3d at 1431

18

(quoting *Better Government Ass'n* v. *Dep't of State*, 780 F.2d 86, 92 (D.C. Cir. 1986)). There is

nothing to "crystalize", *id.*, about the practice of criminal prosecution. And as "there are no

institutional interests favoring postponement of review," Atlas need not establish that deferring

review would impose any particular hardship. *Id.* at 1431 n.9.

Atlas's declaratory judgment claim is not moot.

II.    EVEN IF THE CASE IS MOOT, ATLAS'S INJURIES ARE CAPABLE OF REPETITION WHILE
       EVADING REVIEW.

"The Supreme Court has carved out [an] exception [to mootness] for claims that are

'capable of repetition, yet evading review.'" *Reid* v. *Inch*, 914 F.3d 670, 674 (D.C. Cir. 2019)

(citation omitted). "The exception applies when: (1) the challenged action is in its duration too short

to be fully litigated prior to its cessation or expiration, and (2) there is a reasonable expectation that

the same complaining party will be subject to the same action again." *Id.* (internal quotation marks

omitted).

If this case would have otherwise become moot upon the restoration of the COLA function,

the "capable of repetition, yet evading review" doctrine clearly applies.

A.    Shutdown Injuries Evade Review, Because They Evade Supreme Court Review.

"By 'evading review' the Supreme Court has meant evading *Supreme Court* review. This

court has held that [challenged] actions of less than two years' duration cannot be 'fully litigated'

prior to cessation or expiration, so long as the short duration is typical of the challenged action." *Del*

*Monte,* 570 F.3d at 322 (emphasis added) (internal quotation marks and citation omitted);

The action here—the threat of prosecuting Atlas for publishing beer labels without an

unavailable COLA—lasted 35 days, obviously well-under the D.C. Circuit's two-year zone of

presumptive Supreme Court review evasion. If this short duration is atypical of such injuries, it is

19

atypically *long*. This was the longest shutdown on record. The previous five shutdowns lasted 2, 16, 21, 5, and 3 days, respectively. Exh. B. at 3.

Atlas is constrained to note that the government's argument that Atlas did not obtain an injunction because it was tardy in seeking relief is not well-taken. "Procedural missteps"? Motion at 12. Respectfully – the shutdown began on December 22. By January 15, notwithstanding the holiday season and New Year, Atlas had learned of its rights, hired counsel, and was in court with a full set of comprehensive pleadings (by counsel who also had other professional obligations). And this Court also moved expeditiously to hear the claim. Moreover, had this Court entered a preliminary injunction on Day 35, it would have been unlikely for this Court to have been compelled to vacate its opinion owing to intervening mootness on appeal.

B.     There Is More than a Reasonable Expectation that Atlas Will Be Subjected to the Same Legal Wrong.

A controversy is "capable of repetition" where there exists a "reasonable expectation or a demonstrated probability that the same controversy will recur involving the same complaining party." *FEC* v. *Wis. Right to Life, Inc.*, 551 U.S. 449, 463 (2007) (internal quotation marks omitted). The government's arguments with respect to the "capable of repetition" prong are no better than its "evading review" arguments.

1.     "Controversy"

"[T]he wrong at issue for mootness purposes is defined by the plaintiffs' theory set forth in the complaint." *Del Monte*, 570 F.3d at 323. Courts cannot focus "on whether the precise historical facts that spawned the plaintiff's claims are likely to recur, rather than whether the legal wrong complained of by the plaintiff is reasonably likely to recur, as our precedent requires." *Id*. at 324 (citations omitted).

The question then is whether Atlas "has a reasonable expectation that it will again be subjected to the alleged illegality, or will be subject to the threat of prosecution under the challenged law," *WRTL*, 551 U.S. at 463 (internal quotation marks omitted), not whether the precise shutdown will occur in exactly the same way and for the same reasons. The most recent shutdown involved a dispute over funding for a border wall. The previous major shutdown related to the Affordable Care Act. The next shutdown, as early as this September, might be occasioned not by a funding lapse, but by a debt-limit impasse surrounding who-knows-what issue. This is all quite irrelevant. "Requiring repetition of every 'legally relevant' characteristic of an as-applied challenge—down to the last detail—would effectively overrule" the availability of mootness relief in as-applied cases "by making this exception unavailable for virtually all as-applied challenges. History repeats itself, but not at the level of specificity demanded by the [government]." *Id*.

The controversy is whether Atlas may be prosecuted for publishing a beer label without a COLA when the government stops issuing COLAs. Period, full stop. Is this "capable of repetition?"

       2.     "Capable of Repetition"

The government errs in seeking an iron-clad guarantee that Atlas will be subjected to the same injury at a particular point in time. "[T]he test is not whether there is in fact a 'future relation' that will be affected, but rather whether 'resolution of an otherwise moot case . . . h[as] a *reasonable chance* of affecting the parties' future relations.'" *Honeywell*, 628 F.3d at 577 (internal quotation marks and citation omitted) (alteration in original).

"[R]easonable chance." *Id*. "[R]easonable expectation." *WRTL*, 551 U.S. at 463. "[D]emonstrated probability." *Id*. Considered judgment based on established reality, not a crystal ball, solves the question here.

21

"In estimating the likelihood of an event's occurring in the future, a natural starting point is how often it has occurred in the past." *United Bhd. of Carpenters & Joiners of Am.* v. *Operative Plasterers' & Cement Masons' Int'l Ass'n of the United States*, 721 F.3d 678, 688 (D.C. Cir. 2013) (internal quotation marks omitted). The shuttering of TTB's COLA function owing to a funding lapse has occurred twice in the last six years. Of course airline safety may be more important than the right to publish a beer label, but some insights into probability might be gleaned from considering that the latest version of the highest-selling commercial aircraft ever is currently grounded after two crashes. Despite various learned assurances, many people are reluctant to get on these airplanes, and governments resist their entry into their airspace. After two COLA shutdowns in six years, what assurances can the government provide that funding lapses will never shut the COLA process down again?

As noted *supra*, funding lapses have occurred, on average, once every 2 years in the modern budget era, 21 times in all. That is not infrequent. It nearly equals the 22 California earthquakes measuring at least 6 on the Richter scale in the same time period. Like earthquakes, some funding lapses are felt more deeply or impact more people than others. *See* List of earthquakes in California, available at https://en.wikipedia.org/wiki/List_of_earthquakes_in_California (last visited March 14, 2019). But people plan for these events. Indeed, the government bases the National Flood Insurance Program on the concept of a 100-year flood. Robert Holmes, Jr., *The 100-Year Flood—It's All About Chance (USGS)*, USGS, available at https://water.usgs.gov/edu/100yearflood-basic.html (last visited March 14, 2019).

True, some (but not all) opinions have offered that government shutdowns are unlikely to be repeated— but those opinions were all issued several shutdowns ago. Each passing declaration to the effect that "this will never happen again" becomes less tenable. It is well-past time to admit that

these funding lapses are an inherent feature of our political system. They may not occur on a schedule, but like natural catastrophes, nobody would place odds against their recurrence—or the recurrence of another shutdown. The Court may recall that the previous shutdown ended with only a temporary appropriation lasting from January 25 through February 14, prompting mass speculation as to whether another shutdown would occur on February 15. In another case related to the Treasury Department's budget, one judge of this Court took no chances in setting his calendar. *See* Minute Order, *Nat'l Treasury Employees Union* v. *United States*, D.D.C. No. 19-CV-50 (Jan. 31, 2019) (establishing a schedule "[i]n the event that another shutdown occurs on 2/15/2019"). Atlas's First Amendment rights warrant no less advance consideration.

Notwithstanding the fact that the COLA function shut down, as planned, twice in the last six years, the government speculates that this might never happen again as the Treasury Department's funding requires enactment of only one of twelve appropriations bills. Motion at 13. Under this theory, Russian roulette, played annually, may be a safe game because most of the revolver's chambers are always empty. But the salient number is four: the number of times that Congress has timely enacted all the appropriations bills since 1977. That is not a good track record.

Nonetheless, the government persists with irresponsible speculation. By the next shutdown, "there might have been material changes to the Department's responsibilities with respect to TTB's operations, in which case TTB might make a different decision" about COLA processing. *Id.* And by the next shutdown, the FAA Act might be repealed, or Prohibition might be reintroduced. Or, perhaps, given the understanding that First Amendment rights are at stake, the government will make better decisions. Anything is possible.

This is all very different from the standard here: What is *reasonable* to *expect*? What is the *demonstrated probability*? Since TTB has a written policy in place, implemented twice in the last

six years, to shut down the COLA upon a funding lapse, these are not hard questions. It is reasonable to expect that TTB will follow the written policy it followed twice in the last six years.

For the same reason, the COLA shutdown's impact on Atlas will not be mysterious. Atlas applies for COLAs at a rate of one every 11 days, and it takes approximately 3 weeks to process a COLA. Atlas almost always needs COLA approval. Those are the *facts*. As explained previously, the injury occurs the moment that the COLA process shuts down, because that closure effects a prohibition on speech and an indefinite prior restraint. The government's regulatory 90 day timetable for COLA issuance, which is really 540 days, *see* Reply, 1/21/19, at 6, is thus irrelevant. Indeed, since the TTB claims that it takes less than a week to process a COLA, a sudden shift in its practices to 90 days would create an actionable injury. Stated differently: Atlas could not sue the TTB today for taking 90 days to issue a COLA, because the TTB does not take 90 days. But if the TTB were to adopt a 90 day practice, shutdown or not, the lawsuits would flow freely.

In sum, the allegedly "speculative" or "theoretical" chain of events laid out by the government, Motion at 14, have occurred numerous times in the past and are all-but *guaranteed* to recur in the future:

(1)     "Congress will again fail to appropriate funding for the Executive Branch, thereby causing a lapse in appropriations." Twenty-one appropriation lapses in 42 years is not enough demonstrated probability?

(2)     "[A]ny such lapse would affect the Department of the Treasury." What is suddenly so special about the Treasury Department? It has shut down frequently in the past. Congress places no special priority on funding it.

(3)    "[T]he Department of the Treasury will implement the same contingency plan in the exact same way." Twice in the last six years according to the written plan is not a reliable blueprint for the future? This argument also turns the voluntary cessation doctrine on its head. The government must prove that it will absolutely cease the conduct; Atlas is not required to *disprove* that the government will *not* change.[3]

(4)    "Plaintiff will have one or more pending COLA applications for similar soon-to-perish products at that particular time." Perishability is irrelevant to the prohibition on speech, and Atlas can be damaged even by being unable to move allegedly non-perishable beer. In any event, again, Atlas applies for a COLA, on average, once every 11 days. *See* Exh. A.

Not surprisingly, the government's reliance on *Leonard v. United States DOD*, 38 F. Supp. 3d 99 (D.D.C. 2014), *aff'd* 598 Fed. Appx. 9 (D.C. Cir. 2015), is unavailing. To the extent *Leonard* declined to find a government shutdown to be capable of repetition, *id.* at 106, that was four shutdowns ago. *Leonard*'s next contingency was merely a restatement of the first, the exclusion of chaplains "from any temporary funding schemes." *Id.* If a continuing resolution funds Treasury such that it sustains the COLA process, there is no appropriation lapse. The third *Leonard* factor,

---

[3]A mere promise to reform, without more, is worthless for mootness purposes. "[T]he standard we have announced for determining whether a case has been mooted by the defendant's voluntary conduct is stringent: A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Global Tel\*Link* v. *FCC*, 866 F.3d 397, 407 (D.C. Cir. 2017) (quoting *Friends of the Earth, Inc.* v. *Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000)). That "heavy burden" belongs to the defendant. *Id.* If "[m]ere voluntary cessation of allegedly illegal conduct" sufficed to moot a case, "the courts would be compelled to leave the defendant free to return to his old ways." *United States* v. *Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 203 (1968) (internal quotation marks and punctuation omitted).

the plaintiff's status as a year-to-year contract employee, *id.*, is irrelevant. Atlas is a business. The government can always speculate that a plaintiff will die or go out of business, but that is not too far removed from speculating that the government might be overthrown. For mootness purposes, there will always be an Atlas, and there will always be an Attorney General. The fourth *Leonard* factor is the most distinguishing: the Navy made an "express decision" to change its practices. *Id.*

Also unavailing is *AFGE* v. *Rivlin*, 995 F. Supp. 165 (D.D.C. 1998), where the Court offered that shutdowns are incapable of repetition because none had occurred, since 1995, as of 1998. *Id.* at 166. The Court did not fully review the history of shutdowns, and obviously, was not in a position to consider the many shutdowns that have occurred since. To the extent *AFGE* offered the matter did not evade review, because it was reviewed promptly in the District Court, *id.*, it erred. The other two "budget" cases upon which the government relies, *Foster* v. *Carson*, 347 F.3d 742, 748 (9th Cir. 2003) and *LaShawn A.* v. *Barry*, 144 F.3d 847, 852 (D.C. Cir. 1998), are clearly inapposite, as they involved unusual one-time events, not repeated, systemic failures.

More persuasive—and directly on-point—stands *Pratt* v. *Wilson*, 770 F. Supp. 539 (E.D. Cal. 1991). In *Pratt*, plaintiff recipients under the Aid to Families with Dependent Children ("AFDC") program sued state officials for withholding state and federal AFDC funds for lack of a state budget. When the budget crisis passed, the defendants sought to dismiss the matter as moot.

The court held that the case was capable of repetition, yet evading review. "[G]iven the fact that the state has not timely adopted a budget in five of the last eight years, the court finds it reasonably likely that the plaintiff class may be subjected to the same state action again in the future." *Id.* at 543. Of special relevance,  the court "note[d] that this case constitutes the second time the plaintiff class has faced the issue," *id.*, citing to *Coalition for Econ. Survival* v. *Deukmejian*,

26

171 Cal. App. 3d 954 (1985)—a case decided six years earlier, the same interval between the COLA shutdowns here. The court issued a declaratory judgment.

As Atlas's discussion of prudential concerns shows, *Pratt* is not the only case affording post-shutdown relief.

III.   PRUDENTIAL CONCERNS SUPPORT ACCEPTING, NOT REJECTING, JURISDICTION.

Had Congress enacted a law prohibiting beer labels, or had TTB amended its regulations to reflect a new practice of indefinitely delaying the processing of COLA applications, no court would hesitate to reach the First Amendment questions.

Why should things be any different, just because the legal landscape is the product of legislative omission, rather than commission?

Why should the Court be concerned with "comity for coordinate branches of government" here, Motion at 17 (quoting *Chamber of Commerce of U.S.* v. *U.S. Dep't of Energy*, 627 F.2d 289, 291 (D.C. Cir. 1980)), when the coordinate branches are at best barely aware of the injury they inadvertently inflict? Again, if Congress positively commanded this unconstitutional result, courts would not, out of "comity," decline to adjudicate it. The Court's fulfillment of its ordinary adjudicative function "certainly do[es] not express a lack of respect for the coordinate branches, for 'It is emphatically the province and duty of the judicial department to say what the law is.'" *Covelo Indian Community* v. *Watt*, 551 F. Supp. 366, 379 (D.D.C. 1982) (footnote omitted) (quoting *Marbury* v. *Madison*, 5 U.S. (1 Cranch.) 137, 178 (1802)).

And if the issue is premature now, when would it not be? How would another shutdown and more pointless censorship refine the issues? The government's general sentiments regarding prudence, etc., are all well and good, but they bear little application to this case, which concerns non-fact-specific, generalized legal concepts of the sort that courts routinely adjudicate. And so,

Atlas agrees that this Court should not "intervene in wrangling over the federal budget and budget procedures." Motion at 18 (quoting *Nat'l Wildlife Fed'n* v. *United States*, 626 F.2d 917, 924 (D.C. Cir. 1980)). Nor should this Court ever get "in the middle of a quintessentially political dispute." *Id*. Nor should the Court "second-guess the Executive Branch's emergency decisions made pursuant to the Anti-Deficiency Act." *Id*. None of this is controversial. But even if some budget or shutdown related cases implicate these concerns, this case does not. Atlas has *never* sought any direction by the Court to the government on any political or budgetary matter. All law is the product of politics. And while politics are not the Court's business, the law very much is.

There is nothing magical about shutdowns. Like any set of legal circumstances, they are produced by the action or inaction of political actors, and the courts are called upon to measure the results against the Constitution. If anything, prudence cautions against keeping the people of this country stumbling in constitutional darkness every time the funding lights go out.

At least two courts exemplified the correct approach to prudential concerns in the context of a shutdown controversy. In *Biggs* v. *Wilson*, 828 F. Supp. 774 (E.D. Cal. 1991), plaintiffs sued state officials under the Fair Labor Standards Act ("FLSA") when their paychecks were delayed owing to a government shutdown. The district court awarded them interest on their pay—and a declaratory judgment. "If and when the state should again find itself without a budget, the defendants and other responsible state officials are entitled to know their obligations under the FLSA." *Id*. at 779. The Ninth Circuit affirmed, apparently adding a declaratory judgment of its own. "We therefore hold that state officials' failure to issue the class's paychecks promptly when due violates the FLSA. Paychecks are due on payday. After that, the minimum wage is 'unpaid.'" *Biggs* v. *Wilson*, 1 F.3d 1537 (9th Cir. 1993).

The First Amendment is no less important than the FLSA. If federal courts can let state officials know for next time, after a shutdown, that their behavior violated the FLSA, they can provide similarly useful post-shutdown information about the need to respect First Amendment rights. These are the examples that should be followed here.

Finally, the it is important to recall that in situations such as this, dismissing a case by guessing wrong on a declaratory judgment's potential value can cause significant waste of judicial and litigant resources. A pair of recent cases in this court tell a cautionary tale.[4]

In 2007, the Libertarian National Committee became the beneficiary of a large bequest. The Federal Election Commission applies political contribution limits against the deceased, and forced the LNC to leave the bulk of the gift in an escrow account that would pay it the maximum contribution limit each year until the funds were exhausted. Not wishing to wait for the money, and believing its First Amendment rights were violated, the LNC brought a declaratory action under what is now codified at 52 U.S.C. § 30110, whereby district courts find facts and certify constitutional challenges to federal election laws, for initial decision by the en banc circuit.

Judge Wilkins declined to certify the LNC's categorical challenge to the practice, but certified an as-applied challenge to the en banc D.C. Circuit. *Libertarian Nat'l Comm., Inc*. v. *FEC*, 930 F. Supp. 2d 154 (D.D.C. 2013), *reconsideration denied*, 950 F. Supp. 2d 58 (D.D.C. 2013). Just as the case finally arrived at the circuit court, the escrow funds were exhausted, and the FEC argued the case had become moot. Notwithstanding factual findings that the LNC solicits bequests, 930 F. Supp. 2d at 174 (facts 22 and 23); that the LNC regularly receives bequests, *id*. at 182 (fact 69); that political parties generally receive bequests, *id*. at 183 (facts 72 and 73); and that "many

---

[4]Undersigned counsel represents the plaintiff in that matter.

bequests of amounts far exceeding FECA's annual contribution limit . . . have been left for national party committees in recent years," *id.* at 184 (fact 78); *see generally* facts 76-86, the FEC confidently predicted that "there is no reasonable expectation that the Contribution Limit will restrict a bequest to the LNC again." Suggestion of Mootness, *Libertarian Nat'l Comm.* v. *FEC*, D.C. Cir. No. 13-5088, at 7 (Feb. 3, 2014).

The D.C. Circuit agreed with the FEC and dismissed the case as moot. *Just under five months later*, another gentleman died and left the LNC $235,575.20, leading to another certified election case. *Libertarian Nat'l Comm., Inc.* v. *FEC*, 317 F. Supp. 3d 202 (D.D.C. 2018). The en banc D.C. Circuit heard the case last November. Atlas submits that a third (known) government shutdown of the COLA process may well occur sooner than a third six-figure bequest to the LNC. It would be most prudent to see this case through on the merits.

CONCLUSION

The motion to dismiss should be denied.

Dated:  March 14, 2019                     Respectfully submitted,

Alan Gura (D.C. Bar No. 453449)
Gura PLLC
916 Prince Street, Suite 107
Alexandria, VA 22314
703.835.9085/Fax 703.997.7665

By:   /s/ Alan Gura                                
Alan Gura

Attorney for Plaintiff Atlas Brew Works LLC

30