IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ATLAS BREW WORKS, LLC, | ) | Civil Action No. 19-0079-CRC |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| WILLIAM P. BARR, in his official capacity as | ) | |
| Attorney General of the United States, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

Plaintiff Atlas Brew Works LLC submits the following memorandum of points and

authorities in opposition to Defendant's motion to dismiss.

Dated:  June 10, 2019           Respectfully submitted,

                                Alan Gura (D.C. Bar No. 453449)
                                Gura PLLC
                                916 Prince Street, Suite 107
                                Alexandria, VA 22314
                                703.835.9085/Fax 703.997.7665

                        By:  /s/ Alan Gura_____
                                Alan Gura

                                Attorney for Plaintiff Atlas Brew Works LLC

TABLE OF CONTENTS

Table of Authorities.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

Introduction.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Standard of Review.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Statement of Facts.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

       1.    *The Prior Restraint on Beer Label Speech*.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

       2.    *The Recurring Nature and Frequency of Government Shutdowns.* . . . . . . . . . . . . 5

       3.    *Government Shutdowns Repeatedly Shut Down the COLA Process.* . . . . . . . . . . . 8

       4.    *Atlas Brew Works and Its Perpetual Need of COLAs.* . . . . . . . . . . . . . . . . . . . . . 8

       5.    *Atlas's Recurring Injuries Owing to the Repeated Shutdowns*
            *of the COLA Process.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Summary of Argument.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Argument.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

I.     Atlas Has Standing.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

II.    The Government Fails to Carry Its Heavy Burden in Establishing Mootness.. . . . . . . . . . . 16

      A.    Intervening Legislation Did Not Address Atlas's Declaratory Judgment Claim. . . 18

      B.    Atlas Did Not Only Challenge an Event. It Challenges a Policy.. . . . . . . . . . . . . . 18

III.   Even if the Case Is Moot, Atlas's Injuries Are Capable of Repetition
      While Evading Review.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

      A.    Shutdown Injuries Evade Review Because They Are Typically Too Short
           to Allow for Supreme Court Review.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

      B.    There Is More than a Reasonable Expectation or Demonstrated Probability
           that Atlas Will Be Subjected to the Same Legal Wrong. . . . . . . . . . . . . . . . . . . . . . 25

        1.      "The Same Controversy"......................................... 25

        2.      "Reasonable Chance, Reasonable Expectation,
                  Demonstrated Probability"...................................... 26

             a.      Shutdowns Are Perennial. ................................ 26

             b.      TTB Has Repeatedly Shut Down the COLA Function
                    Pursuant to Its Written Policy............................ 27

             c.      The Next Shutdown Will Injure Atlas. ..................... 28

    C.     The Government's Speculation and Conjecture Are Irrelevant.................. 28

    D.     Precedent Confirms That Shutdown Injuries Are Capable of Repetition ......... 31

IV.    Prudential Concerns Support Accepting, Not Rejecting, Jurisdiction.................. 35

Conclusion.................................................................. 39

TABLE OF AUTHORITIES

Cases

*AFGE* v. *Rivlin*,
   995 F. Supp. 165 (D.D.C. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Alaska* v. *Jewell*, No. 13-cv-34,
   2014 U.S. Dist. LEXIS 103119, 2014 WL 3778590
   (D. Alaska July 29, 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 34

*Better Government Ass'n* v. *Dep't of State*,
   780 F.2d 86 (D.C. Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*\*Biggs* v. *Wilson*,
   1 F.3d 1537 (9th Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 35

*\*Biggs* v. *Wilson*,
   828 F. Supp. 774 (E.D. Cal. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 35, 37

*Boardley* v. *United States DOI*,
   615 F.3d 508 (D.C. Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Chamber of Commerce* v. *Dep't of Energy*,
   627 F.2d 289 (D.C. Cir. 1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*\*City of Houston* v. *Dep't of Housing & Urban Dev.*,
   24 F.3d 1421 (D.C. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Coalition for Econ. Survival* v. *Deukmejian*,
   171 Cal. App. 3d 954 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*\*Covelo Indian Community* v. *Watt*,
   551 F. Supp. 366 (D.D.C. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Defenders of Wildlife* v. *Jackson*,
   791 F. Supp. 2d 96 (D.D.C. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*\*Del Monte Fresh Produce Co.* v. *United States*,
   570 F.3d 316 (D.C. Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19-21, 25

*District of Columbia* v. *Heller*,
   554 U.S. 570 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Doe* v. *Sullivan*,
 938 F.2d 1370 (D.C. Cir. 1991)............................................. 26

*\*FEC* v. *Wis. Right to Life, Inc.*,
 551 U.S. 449 (2007) ................................................... 14, 25

*Finca Santa Elena, Inc.* v. *U.S. Army Corps of Eng'rs*,
 62 F. Supp. 3d 1 (D.D.C. 2015) ........................................ 36

*First Nat'l Bank* v. *Bellotti*,
 435 U.S. 765 (1978) ................................................... 23

*\*Foretich* v. *United States*,
 351 F.3d 1198 (D.C. Cir. 2003)..................................... 35, 37

*Foster* v. *Carson*,
 347 F.3d 742 (9th Cir. 2003) .......................................... 34

*FW/PBS, Inc.* v. *Dallas*,
 493 U.S. 215 (1990) ................................................... 24

*Global Tel\*Link* v. *FCC*,
 866 F.3d 397 (D.C. Cir. 2017) ........................................ 30

*Globe Newspaper* v. *Superior Court*,
 457 U.S. 596 (1982).................................................... 23

*Hewitt* v. *Helms*,
 482 U.S. 755 (1987).................................................... 16

*\*Honeywell Int'l* v. *NRC*,
 628 F.3d 568 (D.C. Cir. 2010) ..................................... 3, 26, 28

*Honig* v. *Doe*,
 484 U.S. 305 (1988)................................................. 25, 26

*\*In re Reporters Comm. for Freedom of the Press*,
 773 F.2d 1325 (D.C. Cir. 1985).................................... 21-23

*Kifafi* v. *Hilton Hotels Ret. Plan*,
 701 F.3d 718 (D.C. Cir. 2012)......................................... 16

*LaRouche* v. *Fowler*,
 152 F.3d 974 (D.C. Cir. 1998)..................................... 20, 22

*LaShawn A.* v. *Barry*,
  144 F.3d 847 (D.C. Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Leonard v. United States DOD*,
  38 F. Supp. 3d 99 (D.D.C. 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 33

*Libertarian Nat'l Comm., Inc.* v. *FEC*,
  930 F. Supp. 2d 154 (D.D.C. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Libertarian Nat'l Comm., Inc.* v. *FEC*,
  No. 18-5227, 2019 U.S. App. LEXIS 14964,
  2019 WL 2180336 (D.C. Cir. May 21, 2019) (en banc). . . . . . . . . . . . . . . . . . . . . . . . 38

*Marbury* v. *Madison*,
  5 U.S. (1 Cranch.) 137 (1802). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Milnot Co.* v. *Richardson*,
  350 F. Supp. 221 (S.D. Ill. 1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Nat'l Forest Rec. Ass'n* v. *Tidwell*,
  No. 13-cv-1287, 2014 U.S. Dist. LEXIS 142210 (E.D. Va. Jan. 24, 2014). . . . . . . . . . . 34

*Nat'l Treasury Employees Union* v. *United States*,
  D.D.C. No. 19-CV-50 (Jan. 31, 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Nat'l Wildlife Fed'n* v. *United States*,
  626 F.2d 917 (D.C. Cir. 1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Parker* v. *District of Columbia*,
  478 F.3d 370 (D.C. Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*\*Pratt* v. *Wilson*,
  770 F. Supp. 539 (E.D. Cal. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*\*Ralls Corp.* v. *Comm. on Foreign Inv.*,
  758 F.3d 296 (D.C. Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 26, 28

*Reid* v. *Inch*,
  920 F.3d 828 (D.C. Cir. 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Sandvig* v. *Sessions*,
  315 F. Supp. 3d 1 (D.D.C. 2018). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Smith* v. *Dep't of Agriculture*,
No. 15-cv-4497, 2016 U.S. Dist. LEXIS 105058,
2016 WL 4179786 (N.D. Cal. Aug. 8, 2016). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*\*Southern Co. Servs.* v. *FERC*,
416 F.3d 39 (D.C. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 23

*Spencer* v. *Kemna*,
523 U.S. 1 (1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

*True the Vote, Inc.* v. *IRS*,
831 F.3d 551 (D.C. Cir. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*United Bhd. of Carpenters & Joiners of Am.* v. *Operative Plasterers
& Cement Masons' Int'l Ass'n of the United States*,
721 F.3d 678 (D.C. Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*United States ex rel. Oliver* v. *Philip Morris USA Inc.*,
826 F.3d 466 (D.C. Cir. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*United States Telecom Ass'n* v. *FCC*,
825 F.3d 674 (D.C. Cir. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 19

*United States* v. *Carolene Products*,
304 U.S. 144 (1938). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*United States* v. *Concentrated Phosphate Export Ass'n*,
393 U.S. 199 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*\*Whole Woman's Health* v. *Hellerstedt*,
136 S. Ct. 2292 (2016). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33


Constitutional Provisions

U.S. Const. art. I, § 9, cl. 7. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6


Statues and Rules

2 U.S.C. § 601 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

27 C.F.R. Part 7. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

27 C.F.R. § 7.41(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 12, 13

27 U.S.C. § 201. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

27 U.S.C. § 205(e). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-5, 12, 13

27 U.S.C. § 207. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 12, 13

31 U.S.C. § 1341.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

52 U.S.C. § 30110.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Other Authorities

Kate Davidson, *U.S. Could Run Out of Room on Debt Ceiling in Late Summer, Mnuchin Says*, Wall Street Journal, May 22, 2019. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

List of earthquakes in California, available at https://en.wikipedia.org/wiki /List_of_earthquakes_in_California (last visited June 8, 2019). . . . . . . . . . . . . . . . . . . . . . 27

Robert C. Lehrman, *TTB Shutdown?*, Bevlog, Sept. 30, 2013 (as updated), available at https://bevlaw.com/bevlog/ttb-shutdown/ (last visited June 8, 2019).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Robert Holmes, Jr., et al., *The 100-Year Flood—It's All About Chance,* U.S. Geological Survey General Information Product 106, available at https://pubs.usgs.gov/gip/106/ (last visited June 8, 2019). . . . . . . . . . . . . . . . 27

Ruth Simon, *Where Did All the Craft Beer Go? Government Shutdown Closes Tap on New Brews*, Wall Street Journal, Jan. 11, 2019 . . . . . . . . . . . . . . . . . . . . . . 4

Suggestion of Mootness, *Libertarian Nat'l Comm.* v. *FEC*, D.C. Cir. No. 13-5088 (Feb. 3, 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Tim Mak, *Meet the Beer Bottle Dictator*, The Daily Beast, Aug. 12, 2014, available at https://www.thedailybeast.com/meet-the-beer-bottle-dictator (last visited June 7, 2019). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

TTB Ruling 2013-1 (Mar. 27, 2013), available at https://www.ttb.gov rulings/2013-1.pdf. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

INTRODUCTION

For the third time, the government has moved to dismiss Atlas's case without addressing the merits. The reason for this basic omission is obvious: The Attorney General's enforcement policy is indefensible. The government cannot ban a category of protected speech, and it cannot impose a prior restraint unbounded by time. Indeed, Congress never intended for Atlas to be silenced in this fashion. Whatever the merits of the Federal Alcohol Administration Act—not challenged here— Congress assumed that the Act would be administered. It is the Attorney General's choice to enforce an unfunded licensing regime. Were that choice defensible, the Attorney General would defend it.

In any event, the government's standing, mootness, and prudential defenses lack merit. This lawsuit began with Atlas's injury, traceable to the government and redressable by the Court. The standing argument appended to the end of the government's brief adds nothing to the discussion of whether or not the case has *become* moot. It has not. Atlas challenged not merely a discreet event, but a policy—and it has not received full relief, as that policy remains in place.

Even were the initial controversy moot, the case would not be, because the injuries here are "capable of repetition, yet evading review." Denying this doctrine's application, the government selectively offers non-precedential, irrelevant, and factually superceded cases in arguing that "this might never happen again." Would that it were so. Government shutdowns happen. Appropriation lapses occur, on average, every two years in the modern budget era, and the Treasury Department has already shut down the label approval process *twice* in Atlas's short history. The government again fails to address precedents where courts have awarded post-shutdown declaratory relief in the face of repeated shutdowns.

The government may ignore these cases, but their examples should be followed here. Nobody seriously believes that shutdowns are a thing of the past. COLA shutdowns, specifically, are a matter of written policy, not speculation. The previous two COLA shutdowns were not accidental. They were by-the-book. So, too, will be the next COLA shutdown.

Shutdown injuries typically evade review. "Evading review" means evading *Supreme Court* review. The D.C. Circuit holds that injuries lasting slightly over two years or less presumptively evade review. And it emphasizes that what matters is an injury's *typical* length. The government's nightmarish hypothetical of some future shutdown lasting longer than two years, and thus beyond the level of presumptive evasion, is not merely remote. It is irrelevant, because shutdowns are typically measured in days.

Having refused to address the merits, and offering only erroneous views of jurisdictional doctrine, the government retreats to prudential theories. This Court would not turn from its Article III duty to address a First Amendment violation. It should not decline to review a policy of inflicting intermittent First Amendment violations. Indeed, the best time to resolve these issues is now. Without an ongoing constitutional deprivation requiring urgent relief, the courts can take more time to consider these important issues. And a declaratory judgment spelling out the First Amendment consequences of shuttering a speech licensing office would give Congress and the Treasury Department time to carefully weigh their options and come up with a plan to avoid needlessly prohibiting an entire category of protected speech. The motion to dismiss should be denied.

### STANDARD OF REVIEW

"For purposes of a motion to dismiss, the facts alleged in the Complaint are taken to be true, and all inferences are drawn in [the plaintiff's] favor." *United States ex rel. Oliver* v. *Philip Morris USA Inc*., 826 F.3d 466, 469 n.2 (D.C. Cir. 2016) (citation omitted). As the government notes, "it is

2

well-settled that this Court may consider materials outside of the pleadings to determine whether it

has subject matter jurisdiction over the claims." Motion at 10 (citations omitted).

The government's statement of the standard of review is otherwise incomplete. The plaintiff

bears the burden of establishing standing at the time the suit is brought. But "[t]he initial 'heavy

burden' of establishing mootness lies with the party asserting a case is moot," while "the opposing

party bears the burden of showing an exception applies." *Honeywell Int'l* v. *NRC*, 628 F.3d 568,

576 (D.C. Cir. 2010) (citations omitted). Mootness must be complete. "[A] heavy burden of

establishing mootness is not carried by proving that the case is *nearly* moot." *True the Vote, Inc*. v.

*IRS*, 831 F.3d 551, 561 (D.C. Cir. 2016) (emphasis added).

STATEMENT OF FACTS

1.    *The Prior Restraint on Beer Label Speech*

The Federal Alcohol Administration Act, 27 U.S.C. § 201 et seq. ("the FAA Act") regulates

the content of alcoholic beverage labels shipped in interstate commerce, requiring and forbidding

various types of speech that such labels might convey. The FAA Act provides that "[i]t shall be

unlawful for any person engaged in business as a . . . brewer . . . [t]o sell or ship or deliver for sale or

shipment, or otherwise introduce in interstate or foreign commerce . . . any . . . malt beverages in

bottles, unless such products are bottled, packaged, and labeled in conformity with such regulations,

to be prescribed by the Secretary of the Treasury, with respect to packaging, marking, branding, and

labeling and size and fill of container . . . ." 27 U.S.C. § 205(e).

The Treasury Secretary's regulations must prohibit various false, misleading, obscene, or

misleading statements, and the disparagement of competitors' products; and require the disclosure of

the beer's identity and quality, the net contents of the container, and the identity of the beer's

manufacturer. 27 U.S.C. § 205(e). This, they do. *See* 27 C.F.R. Part 7.

3

To ensure compliance with federal beer label content standards, the FAA Act subjects all beer labels to a prior restraint, known as a "COLA":

> In order to prevent the sale or shipment or other introduction of . . . malt beverages in interstate or foreign commerce, if bottled, packaged, or labeled in violation of the requirements of this subsection . . . no brewer or wholesaler of malt beverages shall bottle . . . for sale or any other commercial purpose . . . malt beverages . . . unless, upon application to the Secretary of the Treasury, he has obtained and has in his possession a certificate of label approval ["COLA"] covering the . . . malt beverages, issued by the Secretary in such manner and form as he shall by regulations prescribe: *Provided*, That any such . . . brewer or wholesaler of malt beverages shall be exempt from the requirements of this subsection if, upon application to the Secretary, he shows to the satisfaction of the Secretary that the . . . malt beverages to be bottled by the applicant are not to be sold, or offered for sale, or shipped or delivered for shipment, or otherwise introduced, in interstate or foreign commerce.

27 U.S.C. § 205(e). A Treasury regulation likewise provides that "[n]o person may bottle or pack malt beverages, or remove malt beverages from the plant where bottled or packed unless an approved certificate of label approval, TTB Form 5100.31, is issued." 27 C.F.R. § 7.41(a). But brewers need no longer seek exemptions from COLA requirement when selling beer intrastate. *See* TTB Ruling 2013-1 (Mar. 27, 2013), available at https://www.ttb.gov/rulings/ 2013-1.pdf

The TTB administers the COLA requirement. In plaintiff's experience, COLA applications for beer are typically processed within three weeks, First Am. Complaint ("FAC") ¶¶ 10, 16; Cox Decl., 6/7/19, ¶ 12,[1] although TTB might claim that it "normally takes less than a week to approve new labels for beer and other malt beverages." Ruth Simon, *Where Did All the Craft Beer Go? Government Shutdown Closes Tap on New Brews*, Wall Street Journal, Jan. 11, 2019.

In any event, the TTB is no rubber stamp. Under the leadership of its preceding Malt Beverage Labeling Specialist, Kent Battle Martin, the agency gained notoriety for aggressively policing the content of every beer label used in the United States.

---

[1]All citations to Justin Cox's declaration are to the declaration filed contemporaneously with this brief.

Battle has rejected a beer label for the King of Hearts, which had a playing card image on it, because the heart implied that the beer would have a health benefit.

He rejected a beer label featuring a painting called The Conversion of Paula By Saint Jerome because its name, St. Paula's Liquid Wisdom, contained a medical claim—that the beer would grant wisdom.

He rejected a beer called Pickled Santa because Santa's eyes were too "googly" on the label, and labels cannot advertise the physical effects of alcohol. (A less googly-eyed Santa was later approved.)

He rejected a beer called Bad Elf because it featured an "Elf Warning," suggesting that elves not operate toy-making machinery while drinking the ale. The label was not approved on the grounds that the warning was confusing to consumers.

He rejected a Danish beer label that featured a hamburger, which was turned down because the image implied there was a meat additive in the beer.

Tim Mak, *Meet the Beer Bottle Dictator*, The Daily Beast, Aug. 12, 2014, available at

https://www.thedailybeast.com/meet-the-beer-bottle-dictator (last visited June 7, 2019).

The TTB has censored Atlas's labels. It has twice denied Atlas COLAs for using the word

"pumpernickel," which TTB asserted was not an ingredient. More recently, TTB rejected Atlas's

COLA application for "Hop Bot." It claimed a statement that the beer is a "delicious brew to temp

and quench any mega thirst" is a misleading curative or therapeutic claim. Cox Decl. ¶ 6.

The Attorney General may bring an action in the relevant United States District Court "to

prevent and restrain violations of" the FAA Act. 27 U.S.C. § 207. Shipping beer in interstate

commerce without a COLA, in violation of 27 U.S.C. § 205(e), is a misdemeanor punishable by a

fine of up to $1,000 per offense, although the Treasury Secretary is authorized to settle for half. 27

U.S.C. § 207.

2.     *The Recurring Nature and Frequency of Government Shutdowns*

The modern federal budgeting process was created by the Congressional Budget and

Impoundment Control Act of 1974, 2 U.S.C. § 601 et seq. Under this act, "[t]he routine activities of

5

most federal agencies are funded annually by one or more of the regular appropriations acts." Exh.

B, Congressional Research Service, *Federal Funding Gaps: A Brief Overview*, at 1; FAC ¶ 18.

Timely budgets are the very rare exception, not the rule. Since the modern budget process

began with Fiscal Year 1977, "all of the regular appropriations acts have been enacted by the

beginning of the fiscal year in only four instances." FAC ¶ 19, Exh. B at 1.

When, as is usually the case, one or more of these acts are not timely enacted, a "continuing

resolution" ("CR") may supply interim funding. *Id.* But often enough, funding for at least some

government functions lapses. The federal government cannot spend money absent Congressional

appropriation. U.S. Const. art. I, § 9, cl. 7. Where funding expires and "does not resume in time to

continue government operations, then, under the Antideficiency Act [31 U.S.C. § 1341, et seq.], an

agency must cease operations, except in certain situations when law authorizes continued activity."

FAC ¶ 20; Exh. C, Congressional Research Service, *Shutdown of the Federal Government:*

*Causes, Processes, and Effects*, Summary p. 1. "[E]xecutive agencies begin a shutdown of the

affected projects and activities, including the furlough of non-excepted personnel." FAC ¶ 20; Exh.

B at 2.

In the modern budget era, funding lapses have occurred no fewer than twenty-one (21) times.

FAC ¶ 21; Exh. B at 3 (listing twenty funding lapses); Exh. C at 4 & n.20 (recounting "short-

technical lapse" of Feb. 8-9, 2018) (citations omitted). "Multiple funding gaps have occurred during

a single fiscal year in four instances." FAC ¶ 21; Exh. B at 2. Occasionally, a funding lapse falls on

a weekend, or is terminated by a CR before the impacted agencies can complete the process of

shutting down. FAC ¶ 21; Exh. B at 4. And under a previous understanding of the Antideficiency

Act, "the expectation was that agencies would not shut down during a funding gap." *Id.*

But funding gaps have trended toward more severe shutdowns. "The most recent funding gaps—two in FY1996, one in FY2014, one in FY2018, and one in FY2019—all resulted in widespread cessation of non-excepted activities and furlough of associated personnel." FAC ¶ 22; Exh. B at 5. Fiscal year 1996 saw severe shutdowns lasting 5 and 21 days, respectively. FAC ¶ 22; Exh. B at 5-7. Fiscal year 2014 saw a 16 day government shutdown, and of course, the current fiscal year saw a shutdown last 34 full days. FAC ¶ 22; Exh. B at 7-8. This last shutdown was one of three in the current presidential term alone, although fortuitously the previous two coincided with a weekend and occurred overnight, respectively. FAC ¶ 22; Exh. B at 8; Exh. C at 4 & n.20.

Funding lapses are not the only potential cause of government shutdowns. The federal government operates at a deficit, and its ability to borrow money is not unlimited. FAC ¶ 23; *see generally* Exh. D, Congressional Budget Office, *Federal Debt and the Statutory Limit, February 2019*, available at https://www.cbo.gov/ publication/54987. The Treasury Department has been employing extraordinary measures to forestall exceeding the debt ceiling. Barring agreement between Congress and the President, another shutdown will occur in perhaps five months when the federal government's debt ceiling is reached, and the government's deficit spending becomes impossible. The Congressional Budget Office estimates that absent a debt limit increase, Treasury "will probably have sufficient cash to make its usual payments until late in the fiscal year, although an earlier or later date is possible." Exh. D at 4. Should Congress and the President not agree on a debt bill around October 1, 2019, the government's ordinary operation would be impossible, as the country would experience "delays of payments for government activities, a default on the government's debt obligations, or both." *Id.* As CRS puts it, a debt limit impasse may lead to "disruptions in government operations." Exh. C at 8 Box 2; *see* Kate Davidson, *U.S. Could Run Out of Room on Debt Ceiling in Late Summer, Mnuchin Says*, Wall Street Journal, May 22, 2019.

7

3.     *Government Shutdowns Repeatedly Shut Down the COLA Process*

The Antideficiency Act contains some "exceptions" from its prohibition of governmental functions during appropriation lapses. Agencies may designate which of their functions fall under such exceptions. FAC ¶ 24; *see generally* Exh. C at 5-7. Twice in the last six years, the Treasury Department has designated its COLA function as "non-excepted." FAC ¶ 24; *see* Exh. E, TTB Shutdown Plan, September 2013, at 2-3; Exh. F, TTB Shutdown Plan, December 6, 2017.

And twice in the last six years, per that designation, TTB shuttered its COLA function during prolonged funding gaps. When funding ran out September 30, 2013, TTB shut down the COLA process by 9:30 a.m. on October 1, 2013, and kept the process shut until October 17, 2013. FAC ¶ 25; Robert C. Lehrman, *TTB Shutdown?*, Bevlog, Sept. 30, 2013 (as updated), available at https://bevlaw.com/bevlog/ttb-shutdown/ (last visited June 8, 2019); *see also* Exh. G.

When funding ran out December 22, 2018, TTB shut down the COLA process immediately, and kept the process shut until funding was restored January 25, 2019. FAC ¶¶ 26, 27; Cox Decl. ¶ 16; Scalese Decl., 2/27/19, ¶ 2; *see also* Exh. H.

4.     *Atlas Brew Works and Its Perpetual Need of COLAs*

From its solar-powered brewery in Northeast Washington's Ivy City neighborhood, Atlas Brew Works LLC ("Atlas") ships approximately 60,000 cases of craft beer per year, to be enjoyed in and beyond the city's borders. Like most craft brewers, Atlas brews a selection of beers typically available year-round, such as DISTRICT COMMON Craft Lager and PONZI American IPA, and a collection of seasonal beers, including NSFW Double Black IPA and FESTBIER German-style Lager. Atlas's beers contain no preservatives, and are best enjoyed fresh. Atlas distributes approximately 60% of its beer in kegs, and approximately 40% of its beer in cans. Occasionally, Atlas releases

some beer in bottles. Atlas has begun hiring contractors to brew additional quantities of its beers at other locations. FAC ¶ 1; Cox Decl. ¶ 2.

Speech is essential to Atlas Brew Works. Like all beverage producers, Atlas Brew Works must label the containers of its products that it wishes to distribute. It cannot sell, and no one will purchase, random unidentified liquids. And so, Atlas Brew Works expresses itself through the labels it places on cans and kegs containing its beers. Its labels communicate essential information to consumers, such as a beer's brand name, the style and type of beer, a beer's ingredients, its origin, alcohol content, and important safety information. Cox Decl. ¶ 3. Atlas's beer labels also contain other useful information, such as suggested food pairings and Atlas's web address where individuals may read more messages from Atlas. And by its choice of font, color, artwork, and other design elements of its beer labels, Atlas Brew Works seeks to enhance consumers' enjoyment of its product and convey and further the Atlas brand. Cox Decl. ¶ 4; FAC ¶¶ 5, 6.

Atlas was founded May 1, 2012. It sold its first beer to a distributor in August, 2013, and had its market release September 3, 2013. Atlas has obtained 85 COLAs for its various cans, kegs, and bottles since its founding. One application is outstanding. FAC ¶ 12; Cox Decl. ¶ 6; Exh. A.

COLAs were less important to Atlas in its early years, as it did not start distributing beer outside the District of Columbia until March, 2015. Accordingly, the government shutdown of September 30-October 17, 2013, which shuttered the TTB's COLA processing function barely a month after Atlas began selling its first product in Washington, D.C., did not impact Atlas. Cox Decl. ¶ 7. But Atlas never intended to confine its sales to the District of Columbia. It is impossible to foresee Atlas abandoning its substantial interstate market, which Atlas intends to continue growing. Cox Decl. ¶ 8; FAC ¶ 13.

9

Atlas's need for COLAs has increased as the business has grown and proliferated into brewing more types of beer, and at different locations. Excluding one withdrawn surplus application, Atlas applied for 34 COLAs in 2018, or one COLA approximately every 11 days, of which all but one were eventually issued either as applied or following some discussion with TTB. Cox Decl. ¶ 9. Atlas has already applied for 10 COLAs thus far in 2019. Of these, eight were approved, one (for the thirst-quenching "Hop Bot") rejected, and one is outstanding. Atlas expects that the number of COLAs sought and obtained this year will approach or exceed the same number of COLAs sought and obtained last year. Cox Decl. ¶ 10.

5.     *Atlas's Recurring Injuries Owing to the Repeated Shutdowns of the COLA Process*

Atlas, like other brewers, loses money if production facilities are idle, or if fresh product is not delivered and sold to consumers in a timely fashion. Atlas must schedule, in advance, the purchase of its ingredients, the production of its beer at its facilities or those of its contractors, and the timely delivery of finished product to distributors and retail outlets. FAC ¶ 15; Cox Decl. ¶ 11. Atlas also must schedule any necessary design work for, and production of, its cans and other labels. In planning new beers, Atlas allows eight weeks for can label design, three weeks for TTB approval, and six weeks for the production of cans. The design process for bottle labels is the same as for can labels, although the printing of bottle labels takes only two weeks. Atlas's keg collars take much less time to generate, as the brewery has an established keg collar format. FAC ¶ 16; Cox Decl. ¶ 12.

Because COLAs are essential to the sale of beer in interstate commerce, Atlas, like other brewers, factors a certain amount of time for COLA approval into the process. Any inordinate delay in obtaining a COLA can threaten Atlas's business, as Atlas may be left with beer it cannot sell, leaving thirsty consumers and lost market share while production facilities needed to make new beer

are occupied. Apart from the recent government shutdown, delays in the COLA process have not jeopardized Atlas's operations. FAC ¶ 17; Cox Decl. ¶ 13.

On January 3, 2019, Atlas began brewing the first 40 of 100 planned barrels of THE PRECIOUS ONE, a seasonal, apricot-infused India pale ale that it intended to sell between February and April, 2019. Of the initial 40 barrel batch of THE PRECIOUS ONE, Atlas planned to fill 7,200 cans and approximately 40 kegs. It intended to retain four of these kegs for its tap room. Half the remaining kegs would be distributed elsewhere within the District of Columbia, and the other half were planned for distribution to Atlas's five out-of-state distributors in Maryland, Virginia, and Tennessee. FAC ¶ 30; Cox Decl. ¶ 14.

On January 9, 2019, Atlas completed production of THE SHAPE OF FUNK TO COME, a Flanders red ale, and packed 9 kegs of that beer, of which 5 were destined and ready for sale in the interstate market. Atlas packed another 14 kegs of SHAPE on January 28, of which 5 were planned for interstate sale. FAC ¶ 31; Cox Decl. ¶ 15.

On November 28, 2018, Atlas applied for a COLA for cans of THE PRECIOUS ONE. On December 17, 2018, the TTB approved this application. On December 20, 2018, Atlas applied for four COLAs, including for the label to be applied to kegs of THE PRECIOUS ONE. On December 22, 2018, TTB shuttered its COLA process for lack of funding, without having taken any action on Atlas's pending COLA applications, including the COLA application for THE PRECIOUS ONE keg label. On January 3, 2019, Atlas applied for a keg collar COLA for THE SHAPE OF FUNK TO COME. But the COLA process would not reopen until after funding was restored January 25, 2019. FAC ¶¶ 27, 29, 31; Cox Decl. ¶ 16.

Atlas is aware that the government enforces the FAA Act and its COLA requirement. It refrained from causing THE PRECIOUS ONE and THE SHAPE OF FUNK TO COME kegs to be labeled in

interstate commerce because it feared that doing so would subject it, its employees, and officers to prosecution under 27 U.S.C. § 207 for violating the COLA requirement of 27 U.S.C. § 205(e) and 27 C.F.R. § 7.41(a). Atlas refrained from publishing other new beer labels indefinitely for the same reason. FAC ¶ 32; Cox Decl. ¶ 17.

The TTB's funding lapse, and the implementation of its policy to respond to that lapse by shuttering the COLA process, significantly hurt Atlas and its customers. For weeks, Atlas refrained from labeling and placing kegs of THE PRECIOUS ONE in interstate commerce because it lacked a Certificate Of Label Approval for any label that it would place on THE PRECIOUS ONE kegs. Atlas was censored. It was unable to express itself as it wished, and its customers were unable to receive Atlas's speech. The shutdown also extended beyond the normal processing time for THE SHAPE OF FUNK TO COME's COLA. Accordingly, the delivery of that beer, and the publication of its label, was also delayed on account of the shutdown. FAC ¶ 33; Cox Decl. ¶ 18.

The censorship also disrupted Atlas's ability to plan its business. THE PRECIOUS ONE is perishable after 120 days, and seasonal. Atlas could not retain THE PRECIOUS ONE in its fermenting tank indefinitely, as it needed to have the tank vacated of THE PRECIOUS ONE to make room for the production of additional beer. Atlas did not believe it could realistically sell all of THE PRECIOUS ONE intended for interstate keg delivery by other means. A similar problem affected Atlas with respect to THE SHAPE OF THINGS TO COME, as that beer's production was completed during the shutdown while its keg collar COLA application languished. Atlas refrained from entering into a contract with Beltway Brewing, for the brewing of THE 1500 SOUTH CAP lager, because no COLA was available for the distribution of that beer with a Virginia origin. And Atlas was threatened with the loss of interstate sales of its summer seasonal, NINJA SAUCE, for which it had no COLA. FAC ¶ 34; Cox Decl. ¶ 19.

Atlas estimated that its losses from being unable to sell THE PRECIOUS ONE kegs in interstate commerce would be $5,000 for the initial 40 barrel batch, and $15,000 for the total planned 100 barrel production run. These losses were projected to multiply greatly, threatening Atlas's continued existence, as the COLA prohibition effectively shut down further production of new beers and the rebranding of existing beers. The projected lost sales of THE PRECIOUS ONE were not hypothetical. Since having obtained the keg collar COLA for THE PRECIOUS ONE on January 29, 2019, Atlas has sold 20.3 barrels of that beer in 56 kegs to out-of-state distributors. Moreover, due to the delay in sales to distributors, Atlas did not receive the normal market feedback in a timely manner, and so could not brew more beer in time for delivery to the market within THE PRECIOUS ONE's allotted season. Without the interruption of the shutdown, Atlas could have produced and sold an additional 20 barrels of THE PRECIOUS ONE for out-of-state keg distribution. Cox Decl. ¶ 20.

Atlas intends to remain in business, which means, it intends to continue applying for and obtaining COLAs. Atlas requires the continued provision of COLAs to continue speaking as it wishes, and to remain in business. But although Atlas is in perpetual need of COLA approval, it will not subject itself, its officers or employees to prosecution under 27 U.S.C. § 207 for violating the COLA requirement of 27 U.S.C. § 205(e) and 27 C.F.R. § 7.41(a). The next shutdown of the TTB's COLA process will therefore again silence Atlas's speech and imperil its business, unless this Court declares that prosecuting Atlas for publishing without a COLA, when COLAs become unavailable, violates Atlas's First Amendment rights and the rights of its customers. FAC ¶ 36; Cox Decl. ¶ 21.

13

SUMMARY OF ARGUMENT

Standing, assessed at the commencement of litigation, exists. When this lawsuit was brought, the government was restraining Atlas from publishing its beer labels, causing an injury redressable by this Court. The question of whether Atlas continues to have standing is one of mootness.

The government fails to carry its heavy burden in establishing mootness. Atlas has not received all of its requested relief—its claim for declaratory relief remains outstanding. The D.C. Circuit recognizes that mootness of a controversy as to a specific injury does not moot a challenge to the policy that caused that injury. The current restoration of funding for COLA issuance did not impact the Attorney General's challenged policy of enforcing the COLA requirement when COLAs are unavailable. The government ignores the policy challenge, but it remains a part of this case.

Even if the government could establish mootness, this is a classic case of injuries that are "capable of repetition, yet evading review." A matter is "capable of repetition" where there exists a "reasonable expectation or a demonstrated probability that the same controversy will recur involving the same complaining party." *FEC* v. *Wis. Right to Life, Inc*., 551 U.S. 449, 463 (2007) ("WRTL") (internal quotation marks omitted). Both bases for establishing a capability of repetition exist.

There is a "reasonable expectation" that Atlas will be censored again, because shutdowns are a regular feature of our budget process, and it is TTB's written policy to stop issuing COLAs during shutdowns. There is a "demonstrated probability" that Atlas will again be impacted by a COLA shutdown, because COLA shutdowns have already occured *twice* during Atlas's short existence, and Atlas is in perpetual need of COLAs to survive. The government counters this mathematically- and historically-demonstrated probability, rooted in written policy, with wild conjecture—"things might change." Of course things might always change—but the Court must decide the case on the facts as they are, not on the facts as they might, perhaps, someday be. Tellingly, the government does not

14

hint at renouncing its policy of prosecuting Atlas for publishing unlicensed labels when the speech-licensing office is closed.

The government also misstates the law as to "evading review." Because the standard relates to injuries that typically evade *Supreme Court* review, the D.C. Circuit holds that any adverse action typically lasting under two years is presumptively one that "evades review." The government's interesting speculation that a shutdown might last well-over two years is irrelevant. For obvious reasons, all twenty-one budgetary shutdowns going back to the beginning of the modern budget era in 1977 have been measured in *days*. Shutdown injuries evade review because they *typically* (if not inherently) last well under two years—not long enough to obtain Supreme Court review, regardless of how fast litigants and District Courts move.

Finally, the government's alleged prudential concerns are way off the mark. That beer labels are protected speech, and that prior restraints must be defined in time, are well-settled concepts. Nothing in this case asks the Court to decide budget issues or to otherwise intervene in any political dispute. And "do it when you can, not when you have to," is also an apt prudential concern.

ARGUMENT

I.   ATLAS HAS STANDING.

Following 25 pages of argument that Atlas's case has *become* moot, the government concludes with its familiar lack-of-standing language, to which it adds a perfunctory assertion that Atlas lacks standing because it faces no "ongoing or imminent injury." Motion at 27. But this argument, belied by all that precedes it, is only one for mootness. It adds nothing.

"[S]tanding is assessed as of the time the suit commences." *Del Monte Fresh Produce Co. v. United States*, 570 F.3d 316, 324 (D.C. Cir. 2009) (citation omitted). When the suit commenced, Atlas faced a credible threat of prosecution for publishing First Amendment speech without an

15

unavailable license. The case was in the posture of a pre-enforcement challenge to an active criminal prohibition on speech. "[T]he D.C. Circuit has interpreted the Supreme Court's pre-enforcement standing doctrine broadly in the First Amendment sphere." *Sandvig* v. *Sessions*, 315 F. Supp. 3d 1, 15 (D.D.C. 2018). "Standing to challenge laws burdening expressive rights requires only a credible statement by the plaintiff of intent to commit violative acts and a conventional background expectation that the government will enforce the law." *United States Telecom Ass'n* v. *FCC*, 825 F.3d 674, 739 (D.C. Cir. 2016) (internal quotation marks omitted).

Standing is obvious. On review of the relevant law, so is lack of mootness.

II.    THE GOVERNMENT FAILS TO CARRY ITS HEAVY BURDEN IN ESTABLISHING MOOTNESS.

In assessing mootness claims, a court must ask whether its decision would "have a more-than-speculative chance of affecting [the parties] in the future." *Kifafi* v. *Hilton Hotels Ret. Plan*, 701 F.3d 718, 724 (D.C. Cir. 2012). "The real value of the judicial pronouncement—what makes it a proper judicial resolution of a 'case or controversy' rather than an advisory opinion—is in the settling of some dispute *which affects the behavior of the defendant towards the plaintiff*." *Hewitt* v. *Helms*, 482 U.S. 755, 761 (1987).

In assessing whether a dispute remains between the parties, the Court must start with the complaint's description of the dispute. The government correctly states that "[t]he Complaint does not challenge the COLA regulatory process as unconstitutional," Motion at 7, but the remainder of its description is inaccurate. Atlas does not claim that it is "potentially" subject to prosecution for publishing labels without a COLA when COLAs are unavailable, *id.*, Atlas claims that it *is* subject to prosecution for unlicensed speech when COLAs are unavailable. Atlas does not claim that this "*might* constitute a First Amendment violation," *id.* (emphasis added), Atlas claims that this *does* constitute a First Amendment violation. And Atlas does not claim "that the COLA requirement

16

*might* be a content-based prior restraint on speech whenever COLAs are withheld indefinitely." *Id.*

(emphasis added). The COLA requirement is always a content-based prior restraint on speech. Atlas

argues, and the government cannot and does not dispute, that the COLA requirement becomes an

unconstitutional content-based prior restraint on speech when COLAs are withheld indefinitely.

These errors are significant. The government re-writes Atlas's complaint in speculative

terms to elide the continuing dispute about an existing (present tense) policy. On a motion to

dismiss, Atlas is entitled to having any ambiguity on the subject resolved in its favor, but there is

nothing ambiguous about the complaint on this score. "[T]he government does not suspend the

prosecution of brewers for publishing protected First Amendment speech without the (indefinitely

unavailable) COLAs." FAC at 2. "Atlas had always challenged not just the prohibitions of its

particular labels then-needing unavailable COLAs, but the government's *policy* of subjecting Atlas

to criminal prosecution when COLAs are unavailable." *Id.*

> Defendant maintains a policy of enforcing the COLA requirement against unlicensed speech,
> notwithstanding the lack of a COLA function stemming from these budgetary constraints.
> Defendant's policy, and all prosecutorial conduct taken under it, violates Atlas's First
> Amendment rights and the rights of its customers. Atlas is entitled to declaratory and
> injunctive relief against this policy and any act implementing it.

FAC ¶ 40; *see also* FAC ¶ 43. The original complaint sought declaratory relief as well, not merely

an injunction.

Holding that the Attorney General's challenged policy is unconstitutional will impact the

Attorney General's thinking when the government next shuts down and Atlas publishes a beer label.

Granting Atlas relief on its declaratory judgment claim would thus impact the parties' relationship.

Why else would the Attorney General continue resisting this outcome? A decision might also impact

the parties' relationship owing to its impact on Congress, and on TTB, in calling their attention to

the issue, and prompting them to explore the options for reform.

Nonetheless, the government offers two mootness theories, both of which depend on ignoring

the fact that Atlas challenges an existing policy. Neither carries the govenment's heavy burden.

A.       Intervening Legislation Did Not Address Atlas's Declaratory Judgment Claim.

The government spends much effort describing how, "in the context of a facial challenge that

seeks to have a statute 'declared unconstitutional and enjoined,' a matter will be rendered moot"

when the offending statute is legislatively altered to undo the alleged harm. Motion at 13 (collecting

cases). The theory is correct as far as it goes, which is not too far here. As the government concedes,

this case involves no facial challenge. *See* Motion at 7 ("[t]he Complaint does not challenge the

COLA regulatory process as unconstitutional").

Had legislation undone the TTB's policy of shuttering the COLA function during funding

lapses, by either creating a permanent appropriation for COLAs, or underscoring that the need to

issue COLAs is inherent in the delegated function, or perhaps by providing that the COLA function

is an excepted activity necessary to the protection of life or property; or had legislation de-funded the

Justice Department's COLA enforcement during appropriation gaps, *then* the government's

legislative mootness argument would have merit. But Congress did not do any of these things. If

legislation somehow changed the Attorney General's challenged policy, surely the motion to dismiss

would have explained that front and center. Nothing in the recent appropriation suggests that this

scenario would not repeat itself in the next shutdown, just as the appropriation that ended the last

COLA shutdown, only six years ago, did not prevent this most recent COLA shutdown.

B.       Atlas Did Not Only Challenge an Event. It Challenges a Policy.

The government claims that the case is moot because the obviation of Atlas's previous

request for injunctive relief automatically establishes mootness as to the declaratory judgment claim.

For good reason, the government makes this suggestion only obliquely, not wishing to acknowledge

Atlas's challenge to the Attorney General's existing enforcement policy. The end of an injury inflicted under a challenged policy does not moot a challenge to the injurious policy.

The D.C. Circuit recognizes the mootness distinction as between challenges to actions, and challenges to policies. "It is well-established that if a plaintiff challenges both a specific agency action and the *policy* that underlies that action, the challenge to the policy is not necessarily mooted merely because the challenge to the particular agency action is moot." *City of Houston* v. *Dep't of Housing & Urban Dev.*, 24 F.3d 1421, 1428 (D.C. Cir. 1994) (citations omitted). "[A] plaintiff's challenge will not be moot where it seeks declaratory relief as to an ongoing policy." *Del Monte*, 570 F.3d at 321 (citing *Houston*, 24 F.3d at 1429). "[I]f a plaintiff's allegations go not only to a specific agency action, but to an ongoing policy as well, and the plaintiff has standing to challenge the future implementation of that policy, then declaratory relief may be granted if the claim is ripe for review." *Houston*, 24 F.3d at 1430.

The doctrine applies here. Atlas has standing not only because it is a frequent COLA applicant, meaning the challenged policy applies to it, but also because in the First Amendment context, it can rely upon "a conventional background expectation that the government will enforce the law." *United States Telecom Ass'n*, 825 F.3d at 739 (internal quotation marks omitted). And the claim is ripe, as "the disputed claims raise purely legal questions and would, therefore, be presumptively suitable for judicial review." *Houston*, 24 F.3d at 1431 (quoting *Better Government Ass'n* v. *Dep't of State*, 780 F.2d 86, 92 (D.C. Cir. 1986)). There is nothing to "crystalize", *id.*, about the practice of criminal prosecution. And as "there are no institutional interests favoring postponement of review," Atlas need not establish that deferring review would impose any particular hardship. *Id.* at 1431 n.9. Atlas's declaratory judgment claim is not moot.

19

III.    EVEN IF THE CASE IS MOOT, ATLAS'S INJURIES ARE CAPABLE OF REPETITION WHILE
        EVADING REVIEW.

"The Supreme Court has carved out [an] exception [to mootness] for claims that are

'capable of repetition, yet evading review.'" *Reid* v. *Inch*, 920 F.3d 828, 832 (D.C. Cir. 2019)

(citation omitted). "The exception applies when: (1) the challenged action is in its duration too short

to be fully litigated prior to its cessation or expiration, and (2) there is a reasonable expectation that

the same complaining party will be subject to the same action again." *Id.* at 832-33 (internal

quotation marks omitted). If this case would have otherwise become moot upon the restoration of the

COLA function, the "capable of repetition, yet evading review" doctrine clearly applies.

A.    Shutdown Injuries Evade Review Because They Are Typically Too Short
      to Allow for Supreme Court Review.

"By 'evading review' the Supreme Court has meant evading *Supreme Court* review. This

court has held that [challenged] actions of less than two years' duration cannot be 'fully litigated'

prior to cessation or expiration, so long as the short duration is *typical of the challenged action*."

*Del Monte,* 570 F.3d at 322 (emphasis added) (internal quotation marks and citation omitted).

Indeed, even the two-year mark "serves only as a rule-of-thumb," and does not "exclude periods of

slightly greater duration." *LaRouche* v. *Fowler*, 152 F.3d 974, 978 (D.C. Cir. 1998).

Contrary to this circuit precedent, the government claims that "[w]ith respect to evading

judicial review, there is nothing *inherent* about a lapse in appropriations that makes it 'always so

short as to evade review.'" Motion at 11 (quoting *Spencer* v. *Kemna*, 523 U.S. 1, 18 (1998)) (other

citation omitted) (emphasis added). In other words, because government shutdowns could

theoretically exceed two years (!), and by more than a "slightly greater duration," *LaRouche*, 152

F.3d at 978, Atlas might never assert its constitutional rights during shutdowns of shorter duration.

20

The government's argument suffers from at least three fatal flaws. First, Atlas does not seek review of the "lapse in appropriation," but rather, of the Attorney General's policy of enforcing the COLA requirement during such lapses. Of course, the unlawful censorship's duration mirrors that of the appropriation lapse, but it is important to keep these concepts—the censorship, and the lapse— distinct, because Atlas does *not* challenge any budgetary decision or omission. Second, the government's premise strains hypothetical credulity. A shutdown exceeding two years would necessarily traverse a congressional election, and there is a better-than-even chance that such a shutdown would traverse a presidential election as well. If the voters cannot resolve whatever political logjam shuts down the federal government for over two years, meaning, the shutdown might last twice that long, the country might as well be dissolved.

But more to the point of the government's theory, circuit precedent forecloses it.

*Del Monte*'s holding that a short duration indicates that review is evaded "so long as the short duration *is typical* of the challenged action," *Del Monte*, 570 F.3d at 322 (emphasis added), is no aberration. The D.C. Circuit has also read *Spencer*, the source of the government's proposed "inherent duration" rule—but came to a very different conclusion. "This court has emphasized that, when reliance on the mootness exception is based on the short duration of an [action], the question is whether such a short duration is 'typical' of the controversy." *Southern Co. Servs.* v. *FERC*, 416 F.3d 39, 43  (D.C. Cir. 2005) (citing *In re Reporters Comm. for Freedom of the Press*, 773 F.2d 1325, 1329 (D.C. Cir. 1985)). Immediately following this statement, the D.C. Circuit quoted *Spencer*'s passage upon which the government relies. *Southern*, 416 F.3d at 43-44. This was no new position for the D.C. Circuit. Among the Court's earliest applications of *Spencer*, it followed its longstanding rule that "we consider whether the challenged activity is *by its very nature short in*

21

*duration*, so that it could not, *or probably would not*, be able to be adjudicated while fully live."
*LaRouche*, 152 F.3d at 978 (internal quotation marks omitted) (initial emphasis in original, latter emphasis added).

    *Reporters Committee* is also instructive. In that case, reporters sought review of an order extending an earlier protective order, issued in discovery, to the use of exhibits at trial. Although the trial had concluded and the documents had all been unsealed, the D.C. Circuit held that the issue was capable of repetition, as the press could face similar protective orders in future cases. As to evasion of review, the D.C. Circuit noted that the original protective order might have extended to the trial as well. "But even accepting the beginning of discovery as the starting point for computing the availability of review with regard to sealing both before and during trial, we still find that the reporters' claim would evade review." *Reporters Comm.*, 773 F.2d at 1329. "The interval of time that *typically* elapses between the beginning of discovery and the completion of trial in a civil case is hard to measure, but it is safe to conclude that it is less than two years, which the Supreme Court has held short enough to cause action which would be mooted if not reviewed within that time to evade review." *Id.* (citation omitted). If the D.C. Circuit had ever replaced its typicality standard with the more rigid inherent/necessarily standard proffered by the government, the government's brief does not reveal that event.

    Where a conflict arises between Supreme Court and D.C. Circuit precedent on jurisdictional matters, the D.C. Circuit applies its own precedent until it is told otherwise. *See Parker* v. *District of Columbia*, 478 F.3d 370, 374-75 (D.C. Cir. 2007), *aff'd on other grounds sub nom. District of Columbia* v. *Heller*, 554 U.S. 570 (2008). But there is no conflict here. The Supreme Court has repeatedly dealt with evasion of review as a matter of typicality. For example, *Reporters Committee*

relied on *Globe Newspaper* v. *Superior Court*, 457 U.S. 596 (1982), where the Supreme Court "found that the issue of the constitutionality of closure of a criminal trial to the press evaded review 'because criminal trials are *typically* of 'short duration.'" *Reporters Comm.*, 773 F.2d at 1329 (quoting *Globe*, 457 U.S. at 603); *see also First Nat'l Bank* v. *Bellotti*, 435 U.S. 765, 774 (1978) ("under no reasonably foreseeable circumstances could appellants obtain plenary review by this Court of the issue" in time).

Precedent reflects the reality that many actions warranting review are of an uncertain duration. Jurisdiction cannot be defeated by imagining some bizarre hypothetical where actions always measured in days would, against all reason, suddenly last years. The rule in this circuit (and at the Supreme Court) "emphasize[s]" the typicality of an event's duration. *Southern*, 416 F.3d at 43. The action here—the threat of prosecuting Atlas for publishing beer labels without an unavailable COLA—lasted 35 days, obviously well-under the D.C. Circuit's two-year zone of presumptive Supreme Court review evasion. If this short duration is atypical of such injuries, it is atypically *long*. This was the longest shutdown on record. The previous five shutdowns lasted 2, 16, 21, 5, and 3 days, respectively. Exh. B. at 3. Injuries of the kind Atlas suffered in the most recent shutdown are typically of a duration so short as to evade review.

The government's argument that Atlas did not obtain an injunction because it was tardy in seeking relief is not well-taken. "Procedural missteps"? Motion at 17. The latest shutdown began on December 22. By January 15, notwithstanding the holiday season and New Year, Atlas had learned of its rights, hired counsel, and was in court with a full set of comprehensive pleadings (by counsel who also had other professional obligations). How fast *should* Atlas have moved? The day after the shutdown began? A week later? The government's argument presumes that the Court would rule

within a particular time. Atlas believes (and appreciates) that the Court acted expeditiously in this matter. Atlas also moved quickly, as quickly as it could, for the simple reason that it wanted relief.

But even had Atlas moved on December 23, it could not have expected the Supreme Court to decide the case within 35 days. *See Ralls Corp.* v. *Comm. on Foreign Inv.*, 758 F.3d 296, 323 (D.C. Cir. 2014) ("[e]ven if Ralls had sought judicial review of the CFIUS Order on the day it issued, it could not have obtained review by the district court, this Court and the Supreme Court before the order was revoked"); *Alaska* v. *Jewell*, No. 13-cv-34, 2014 U.S. Dist. LEXIS 103119 at *14 n.35, 2014 WL 3778590 (D. Alaska July 29, 2014) ("there was no action that [P]laintiffs failed to take that would have prevented this case from becoming moot") (citation omitted).

Finally, there is no merit—or even logic—to the government's claim that Atlas has somehow admitted the availability of review by "cast[ing] doubt on whether lapses in appropriations will *necessarily* be resolved in such a short timeframe, alleging that its free speech is infringed during a shutdown precisely because 'the government suspends the operation of the COLA process indefinitely.'" Motion at 17 (quoting FAC ¶ 42). First, as discussed *supra*, the standard is not "necessarily," but "typically." That the government can hypothecate a far-fetched shutdown exceeding well-past two years is irrelevant. Second, there is no contradiction in pointing out that an injury has an indefinite duration, typically lasting a matter of days. The government does not deny that "a prior restraint that fails to place limits on the time within which the decisionmaker must issue the license is impermissible." *FW/PBS, Inc.* v. *Dallas*, 493 U.S. 215, 226 (1990) (plurality) (citations omitted); *Boardley* v. *United States DOI*, 615 F.3d 508, 518 (D.C. Cir. 2010). The censorship here is unconstitutional because it is of an indefinite duration. The fact that its duration is typically under two years only means the wrong evades review; it does not cure the illegality.

24

B.    There Is More than a Reasonable Expectation or Demonstrated Probability
      that Atlas Will Be Subjected to the Same Legal Wrong.

A controversy is "capable of repetition" where there exists a "reasonable expectation or a

demonstrated probability that the same controversy will recur involving the same complaining

party." *WRTL*, 551 U.S. at 463 (internal quotation marks omitted). Atlas need only establish either

circumstance, *Honig* v. *Doe*, 484 U.S. 305, 318 n.6 (1988), but the facts and the law plainly

establish *both* a "reasonable expectation" *and* a "demonstrated probability" of recurrence.

1.    "The Same Controversy"

"[T]he wrong at issue for mootness purposes is defined by the plaintiffs' theory set forth in

the complaint." *Del Monte*, 570 F.3d at 323. Courts cannot focus "on whether the precise historical

facts that spawned the plaintiff's claims are likely to recur, rather than whether the legal wrong

complained of by the plaintiff is reasonably likely to recur, as our precedent requires." *Id*. at 324

(citations omitted).

The question then is whether Atlas "has a reasonable expectation that it will again be

subjected to the alleged illegality, or will be subject to the threat of prosecution under the challenged

law," *WRTL*, 551 U.S. at 463 (internal quotation marks omitted), not whether the next shutdown

will occur in exactly the same way and for the same reasons as the last one. The most recent

shutdown involved a border wall dispute. The previous major shutdown related to the Affordable

Care Act. No one knows what issue will precipitate the next shutdown, but the precise reason is

quite irrelevant. "Requiring repetition of every 'legally relevant' characteristic of an as-applied

challenge—down to the last detail—would effectively overrule" the availability of mootness relief in

as-applied cases "by making this exception unavailable for virtually all as-applied challenges.

History repeats itself, but not at the level of specificity demanded by the [government]." *Id*.

25

The controversy is whether Atlas may be prosecuted for publishing a beer label without a COLA when the government stops issuing COLAs. Period, full stop. Is this scenario "capable of repetition," either as a "reasonable expectation" or a "demonstrated probability?"

      2.      "Reasonable Chance, Reasonable Expectation, Demonstrated Probability"

The government errs in seeking an iron-clad guarantee that Atlas will be subjected to the same injury at a particular point in time. "[T]he test is not whether there is in fact a 'future relation' that will be affected, but rather whether 'resolution of an otherwise moot case . . . h[as] a *reasonable chance* of affecting the parties' future relations.'" *Honeywell*, 628 F.3d at 577 (internal quotation marks and citation omitted) (alteration in original).

"The Supreme Court has instructed that the capable-of-repetition prong is not to be applied with excessive 'stringency.'" *Ralls*, 758 F.3d at 324 (quoting *Honig*, 484 U.S. at 318 n.6). "In other words, a controversy need only be '*capable* of repetition,' not 'more probable than not.'" *Id.* (quoting *Honig*, 484 U.S. at 318 n.6). "It is enough . . . that the litigant faces some likelihood of becoming involved in the same controversy in the future." *Id.* (quoting *Doe* v. *Sullivan*, 938 F.2d 1370, 1378-79 (D.C. Cir. 1991)).

Considered judgment based on established reality, not a crystal ball, solves the question here, with reference to the three elements of Atlas's injury: (1) a shutdown (2) causing TTB to suspend the issuance of COLAs while (3) Atlas requires a COLA.

      a.      Shutdowns Are Perennial.

"In estimating the likelihood of an event's occurring in the future, a natural starting point is how often it has occurred in the past." *United Bhd. of Carpenters & Joiners of Am.* v. *Operative Plasterers' & Cement Masons' Int'l Ass'n of the United States*, 721 F.3d 678, 688 (D.C. Cir. 2013) (internal quotation marks omitted).

As noted *supra*, funding lapses have occurred, on average, once every 2 years in the modern budget era, 21 times in all. That is not infrequent. It nearly equals the 22 California earthquakes measuring at least 6 on the Richter scale in the same time period. *See* List of earthquakes in California, available at https://en.wikipedia.org/wiki/List_of_ earthquakes_in_California (last visited June 8, 2019). Like funding lapses, some earthquakes are felt more deeply or impact more people than others. But people plan for these events. Indeed, the government bases the National Flood Insurance Program on the concept of a 100-year flood. Robert Holmes, Jr., et al., *The 100-Year Flood—It's All About Chance,* U.S. Geological Survey General Information Product 106, available at https://pubs.usgs.gov/gip/106/ (last visited June 8, 2019).

Funding lapses are an inherent feature of our budgetary system. Like natural disasters, they are unscheduled, yet nobody would place odds against their recurrence. The Court may recall that the previous shutdown ended with only a temporary appropriation lasting from January 25 through February 14, prompting mass speculation as to whether another shutdown would occur on February 15. In another case related to the Treasury Department's budget, one judge of this Court took no chances in setting his calendar. *See* Minute Order, *Nat'l Treasury Employees Union* v. *United States*, D.D.C. No. 19-CV-50 (Jan. 31, 2019) (establishing a schedule "[i]n the event that another shutdown occurs on 2/15/2019").

Another shutdown is only a matter of time. As is the next one, and the one after that.

           b.        TTB Has Repeatedly Shut Down the COLA Function
                         Pursuant to Its Written Policy.

Funding lapses have shuttered TTB's COLA function twice in the last six years. The choice to suspend COLA processing during funding lapses was made, in advance, in writing, and that

policy remains in place. It is reasonable to expect that during the next shutdown, TTB will follow

the written policy it followed the previous two times.

> c.      The Next Shutdown Will Injure Atlas.

Atlas applies for COLAs at a rate of one every 11 days, and it takes approximately 3 weeks

to process a COLA. Atlas almost always needs at least one COLA. Its business depends utterly on

evolving its product line, which requires a stream of COLAs. The very suspension of the COLA

issuance process throws Atlas's business into disarray, and there is all but a mathematical certainty

that a COLA shutdown will leave at least one of Atlas's applications hanging.

> C.      The Government's Speculation and Conjecture Are Irrelevant.

Notwithstanding the reality that shutdowns are perennial, that COLA issuance is shuttered as

a matter of written policy during shutdowns, that shutdowns have in fact suspended the COLA

process twice in the past six years, and that Atlas depends utterly on COLAs, the government offers

a string of conjecture as to why "it is entirely speculative whether—and if so, when—Congress

might again fail to appropriate funding for Executive Branch agencies." Motion at 18. These are the

wrong questions. "[A] controversy is capable of repetition even if its recurrence is far from certain."

*Ralls*, 758 F.3d at 324. The standard is not *whether* or *when* there will ever be another shutdown,

but whether there is a "reasonable chance," *Honeywell*,  628 F.3d at 577, "reasonable expectation,"

*WRTL*, 551 U.S. at 463, or "demonstrated probability," *id.*, of another shutdown impacting Atlas.

The government misstates the legal standard because it cannot seriously claim that there is

no reasonable chance of another shutdown, no reasonable expectation of another shutdown, or no

demonstrated probability that our political system and budget structure generates shutdowns. The

government maintains shutdown plans—including the one giving rise to this case—and DOJ "has

published several opinions on the subject," Motion at 4, precisely because shutdowns occur.

Notwithstanding the fact that the COLA function shut down, as planned, twice in the last six years, the government speculates that this might never happen again as the Treasury Department's funding requires enactment of only one of twelve appropriations bills. *Id.* Under this theory, Russian roulette, played annually, may be a safe game because most of the revolver's chambers are always empty. But the salient number is four: the number of times that Congress has timely enacted all the appropriations bills since 1977. That is not a good track record.

Nonetheless, the government persists with irresponsible speculation. By the next shutdown, the Treasury Department might change its guidance. It might decide to change its existing policy for any number of reasons, including a change in "governing legal authorities." Motion at 19. In other words, by the next shutdown, the FAA Act might be repealed, or Prohibition might be reintroduced. Or, perhaps, given that First Amendment rights are at stake, the government will make better decisions. *Anything is possible*. No relief can be had against the wrongdoer, because it might change its mind. Under this view, there is no "capable of repetition" doctrine. Notably, for all the musing about TTB, the Attorney General does not float changing the challenged enforcement policy.

The government next claims that the next COLA shutdown might not injure Atlas, because TTB allegedly has 90 days to issue a COLA. The argument has two flaws. First, with respect to a particular label, Atlas sustains injury the moment that the COLA process shuts down, because that closure effects a prohibition on speech and an indefinite prior restraint. The government's regulatory timetable for COLA issuance, which is really 540 and not 90 days, *see* Reply, 1/21/19, at 6, is irrelevant. Second, since the TTB claims that it takes less than a week to process a COLA, a sudden shift in its practices to 90 days would create an actionable injury. The only reason that TTB has not been sued for taking 90 days to issue a COLA is because it does not maintain such a practice.

29

The government is correct about one thing: The Court is indeed presented with "an extended chain of speculation." Motion at 19. Arguments along the lines of "shutdowns might never happen again" and "we might change our behavior" are speculative. The hard evidence of how often shutdowns occur, the government's written policy, and Atlas's reliance on COLAs, are reality. Each of the allegedly speculative events laid out by the government, Motion at 20, have occurred repeatedly and are all-but guaranteed to recur in the future:

(1)     "Congress will again fail to appropriate funding for the Executive Branch, thereby causing a lapse in appropriations." Twenty-one appropriation lapses in 42 years is not enough demonstrated probability?

(2)     "[A]ny such lapse would affect the Department of the Treasury." What is suddenly so special about the Treasury Department? It has shut down frequently in the past. Congress places no special priority on funding it.

(3)     "[T]he Department of the Treasury will implement the same contingency plan in the exact same way." Twice in the last six years according to the written plan is not a reliable blueprint for the future? This argument also turns the voluntary cessation doctrine on its head. The government must prove that it will absolutely cease the conduct; Atlas is not required to *disprove* that the government will *not* change.[2]

---

[2] A mere promise to reform, without more, is worthless for mootness purposes. "[T]he standard we have announced for determining whether a case has been mooted by the defendant's voluntary conduct is stringent: A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Global Tel*Link* v. *FCC*, 866 F.3d 397, 407 (D.C. Cir. 2017) (internal quotation marks omitted). That "heavy burden" belongs to the defendant. *Id.* If "[m]ere voluntary cessation of allegedly illegal conduct" sufficed to moot a case, "the courts would be compelled to leave the defendant free to return to his old ways." *United States* v. *Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 203 (1968) (internal quotation marks and punctuation omitted).

(4)    "Plaintiff will have one or more pending COLA applications for similar

soon-to-perish products at that particular time." Perishability is irrelevant to the

prohibition on speech, and Atlas can be damaged even by being unable to move

allegedly non-perishable beer. In any event, again, Atlas nearly always has at least

one outstanding COLA, as it applies for a COLA, on average, once every 11 days.

\* \* \*

D.     Precedent Confirms That Shutdown Injuries Are Capable of Repetition.

Directly on-point stands *Pratt* v. *Wilson*, 770 F. Supp. 539 (E.D. Cal. 1991). In *Pratt*,

plaintiff recipients under the Aid to Families with Dependent Children ("AFDC") program sued

state officials for withholding state and federal AFDC funds for lack of a state budget. When the

budget crisis passed, the defendants sought to dismiss the matter as moot.

The court held that the case was capable of repetition, yet evading review. "[G]iven the fact

that the state has not timely adopted a budget in five of the last eight years, the court finds it

reasonably likely that the plaintiff class may be subjected to the same state action again in the

future." *Id*. at 543. Of special relevance, the court "note[d] that this case constitutes the second time

the plaintiff class has faced the issue," *id*., citing*Coalition for Econ. Survival* v. *Deukmejian*, 171

Cal. App. 3d 954 (1985)—a case decided six years earlier, the same interval between the COLA

shutdowns here. The court issued a declaratory judgment.

Also on-point is *Biggs* v. *Wilson*, 828 F. Supp. 774 (E.D. Cal. 1991), where plaintiffs sued

state officials under the Fair Labor Standards Act ("FLSA") when their paychecks were delayed

owing to a government shutdown. Notwithstanding the restoration of funding, the district court

awarded them interest on their pay—and a declaratory judgment. The Ninth Circuit affirmed,

apparently adding a declaratory judgment of its own. "We therefore hold that state officials' failure

31

to issue the class's paychecks promptly when due violates the FLSA. Paychecks are due on payday. After that, the minimum wage is 'unpaid.'" *Biggs* v. *Wilson*, 1 F.3d 1537, 1544 (9th Cir. 1993).

Ignoring these published precedents holding that shutdown injuries fall within the "capable of repetition yet evading review" doctrine, the government reaches for irrelevant, nonprecedential, and factually superceded cases.

What the government claims to be "the most relevant precedent directly on point," Motion at 21, *Leonard v. United States DOD*, 38 F. Supp. 3d 99 (D.D.C. 2014), *aff'd* 598 Fed. Appx. 9 (D.C. Cir. 2015), is unavailing. In *Leonard*, the Navy barred a civilian chaplain from holding religious services during a government shutdown. The day after the chaplain filed suit, the Navy reversed course, allowed him to work, and resumed paying him notwithstanding some contractual disputes between the parties.

This Court held that despite the short duration of most government shutdowns, "it does not *necessarily* follow" that shutdown actions are capable of repetition. *Leonard*, 38 F. Supp. 3d at 106 (emphasis added). The parties' dispute fell outside the doctrine because (1) the government might not shut down again or (2) suspend payments to chaplains, (3) Father Leonard works only on annual contracts and might not perform the same service, and—critically—"(4) the Navy would need to apply the Anti-Deficiency Act so as to limit chaplains' religious activities *despite the express decision not to do so* at the end of the most recent government shutdown." *Id.* (emphasis added).

*Leonard* is readily distinguishable. First, to the extent *Leonard* declined to find a government shutdown to be capable of repetition, *id.*,—that was *four* shutdowns ago. The Supreme Court has long acknowledged that changed circumstances undermine even controlling precedent (which *Leonard* is not). "Factual developments may show that constitutional harm, which seemed too remote or speculative to afford relief at the time of an earlier suit, was in fact indisputable."

*Whole Woman's Health* v. *Hellerstedt*, 136 S. Ct. 2292, 2305 (2016); *see also United States* v.

*Carolene Products*, 304 U.S. 144, 153 (1938) ("the constitutionality of a statute predicated upon

the existence of a particular state of facts may be challenged by showing to the court that those facts

have ceased to exist").[3] The D.C. Circuit has never published a precedential opinion holding that

shutdowns are incapable of repetition. It is difficult to imagine the Court venturing out on that

counterfactual limb today.

    *Leonard*'s second contingency was merely a restatement of the first, the exclusion of

chaplains, specifically, "from any temporary funding schemes." *Leonard*, 38 F. Supp. 3d at 106.

But it is plainly distinguishable here. *Leonard* involved the first and last exclusion of chaplains.

Here, TTB has already twice shut down the COLA process during Atlas's existence. The third

*Leonard* factor, the plaintiff's status as a year-to-year contract employee, is irrelevant. Atlas is a

business. The government can always speculate that a plaintiff will die or go out of business, but

that is not too far removed from speculating that the government might be overthrown. For mootness

purposes, there will always be an Atlas, and there will always be an Attorney General. The fourth

*Leonard* factor is the most distinguishing, and fatal to the government's claim of relevance: the

Navy made an "express decision" to change its practices. *Id.* No such decision was made here.

    Also unavailing is *AFGE* v. *Rivlin*, 995 F. Supp. 165 (D.D.C. 1998), where the Court

offered that shutdowns are incapable of repetition because none had occurred, since 1995, as of

1998. *Id.* at 166. The Court did not fully review the history of shutdowns, and obviously, was not in

a position to consider the many shutdowns that have occurred since. To the extent *AFGE* offered the

matter did not evade review, because it was reviewed promptly in the District Court, *id.*, it erred. As

---

    [3]The statute at issue in *Carolene Products* was eventually invalidated on changed
circumstances grounds. *Milnot Co.* v. *Richardson*, 350 F. Supp. 221, 225 (S.D. Ill. 1972).

noted *supra*, what matters for evasion purposes is the prospect of Supreme Court review, presumptively, a process that lasts somewhat longer than two years.

The government's other "budget" cases are similarly unavailing. In *Alaska* v. *Jewell*, the court agreed with Atlas's position here that shutdowns evade judicial review. *Alaska*, 2014 U.S. Dist. LEXIS 103119 at *12 (footnote omitted). However, the plaintiff lacked evidence that previous shutdowns had ever created the same injury. In contrast, the evidence here shows that COLA issuance has *twice* been shut down in the past six years, and more to the point, that this occurred pursuant to a written policy. The same feature distinguishes *Foster* v. *Carson*, 347 F.3d 742 (9th Cir. 2003) and *LaShawn A.* v. *Barry*, 144 F.3d 847 (D.C. Cir. 1998), which also involved unusual one-time events. *See Foster*, 347 F.3d at 748 ("[t]he only fact in the record before us that supports this [capable of repetition] claim is that it happened once"); *LaShawn A.*, 144 F.3d at 851 ("legislation adopted to deal with the District's fiscal crisis has expired").

Even less useful is *Smith* v. *Dep't of Agriculture*, No. 15-cv-4497, 2016 U.S. Dist. LEXIS 105058, 2016 WL 4179786 (N.D. Cal. Aug. 8, 2016). In *Smith*, the injury was not merely incapable of repeating; it was not even capable of occurring once. "The Federal Defendants . . . explain—and Plaintiff does not contest,—that such a series of events have never occurred in the past and no one, including plaintiff, has [ever] lost SNAP benefits as a result of a lapse in appropriations." *Smith*, 2016 U.S. Dist. LEXIS 105058 at *8-*9 (internal quotation marks and citations omitted). Finally, the two-paragraph order in *Nat'l Forest Rec. Ass'n* v. *Tidwell*, No. 13-cv-1287, 2014 U.S. Dist. LEXIS 142210 (E.D. Va. Jan. 24, 2014), is useless as precedent, because the court did not describe any of the contingencies it found to be too remote.

Unmindful of history, the government offers that "this Court should be extremely reluctant" to contradict suggestions that shutdowns do not recur "when there is no compelling reason for doing so." Motion at 22. To the contrary—the wholesale prohibition of an entire category of protected First Amendment speech, for the second time in six years, is as good a reason as any for courts to take action (to say nothing of the myriad other disruptions and injuries that shutdowns occasion).

If courts can let officials know for next time, after a shutdown, that their behavior violated the FLSA, *Biggs*, 828 F. Supp. at 779, *aff'd*, 1 F.3d 1537, they can provide similarly useful post-shutdown information about the need to respect First Amendment rights. Shutdowns are not going away. Americans should know what their rights and obligations are during these events.

IV.    PRUDENTIAL CONCERNS SUPPORT ACCEPTING, NOT REJECTING, JURISDICTION.

Perhaps aware that Atlas has standing, that the case involves a non-moot policy challenge, and that in any event, the case is one capable of repetition yet evading review, the government seeks refuge in prudential mootness. The doctrine is inapposite.

"Prudential mootness allows the Court to dismiss a case that is not actually moot but is so attenuated that considerations of prudence and comity for coordinate branches of government counsel the Court to stay its hand, and to withhold relief that it has the power to grant." *Defenders of Wildlife* v. *Jackson*, 791 F. Supp. 2d 96, 114 (D.D.C. 2011) (quoting *Chamber of Commerce* v. *Dep't of Energy*, 627 F.2d 289, 291 (D.C. Cir. 1980)). "This doctrine is relevant where it is unlikely that the court's grant of declaratory judgment will actually relieve the injury, especially where exercising discretion would avoid adjudication of difficult or novel constitutional questions." *Id.* (quoting *Foretich* v. *United States*, 351 F.3d 1198, 1216 (D.C. Cir. 2003)).

None of these considerations are present here. Atlas agrees that this Court should not "intervene in wrangling over the federal budget and budget procedures." Motion at 25 (quoting

*Nat'l Wildlife Fed'n* v. *United States*, 626 F.2d 917, 924 (D.C. Cir. 1980)). Nor should this Court

"place itself in the middle of a political dispute—namely, a dispute over the federal budgetary

process, and how the government should operate when that budgetary process fails." *Id*. But Atlas

does not ask this Court to pass on budgetary matters. Atlas seeks only a declaration that the Attorney

General violates the First Amendment when he enforces a law under particular circumstances, the

formation of which is not subject to intervention. The political branches often have discretion in

responding to judicial decisions, and this case is no different. With the benefit of this Court's

judgment, Congress could still budget as it pleases. It could give COLA funding more secure

footing, direct the COLA function's designation as excepted, repeal the requirement, create an

exception—or do nothing, accepting that enforcement is constitutionally tied to COLA availability.

    Had Congress enacted a law prohibiting beer labels, or had TTB amended its regulations to

reflect a new practice of indefinitely delaying the processing of COLA applications, no court would

hesitate to reach the First Amendment questions. Why should things be any different, just because

the injury is the product of legislative omission, rather than commission? The Court's fulfillment of

its ordinary adjudicative function "certainly do[es] not express a lack of respect for the coordinate

branches, for 'It is emphatically the province and duty of the judicial department to say what the law

is.'" *Covelo Indian Community* v. *Watt*, 551 F. Supp. 366, 379 (D.D.C. 1982) (footnote omitted)

(quoting *Marbury* v. *Madison*, 5 U.S. (1 Cranch.) 137, 178 (1802)). Judgments declaring First

Amendment rights are not imprudent meddling in political affairs.

    A declaratory judgment will relieve Atlas of its injuries. While prudential mootness might

occur when "the plaintiff will have ample opportunity to renew their complaint," *Finca Santa

Elena, Inc*. v. *U.S. Army Corps of Eng'rs*, 62 F. Supp. 3d 1, 4 (D.D.C. 2015) (internal quotation

marks and punctuation omitted), a renewed complaint, during the next shutdown, will only lead the parties to this same place when funding is restored.

The government should not be heard to argue about alleged "complexity" and "sensitivity." Motion at 24. These factors are not in play, as the case "implicate[s] a constitutional provision" —the First Amendment—"with respect to which case law provides ample interpretive guidance." *Foretich*, 351 F.3d at 1216. The government does not avoid discussing the case's merits because they are difficult, but because they are simple.

There is nothing magical about shutdowns. Like any set of legal circumstances, they are produced by the action or inaction of political actors, and the courts are called upon to measure the results against the Constitution. If anything, prudence cautions against keeping the people of this country stumbling in constitutional darkness every time the funding lights go out. *See Biggs*, 828 F. Supp. at 779 ("[i]f and when the state should again find itself without a budget, the defendants and other responsible state officials are entitled to know their obligations under the FLSA.").

It is best to deal with this matter now, rather than during the exigency of the next shutdown. The Court can take time to reflect on the matter, and the government can weigh its response without an overhanging injunction. Dismissing this case now will not make the issue go away. It will only serve to have this issue returned before the Court at the outset of the next shutdown, needlessly wasting judicial and litigant resources.

On this score, a pair of recent cases in this court tell a cautionary tale. In 2007, the Libertarian National Committee became the beneficiary of a large bequest. The Federal Election Commission applies political contribution limits against the deceased, and forced the LNC to leave the bulk of the gift in an escrow account that would pay it the maximum contribution limit each year until the funds were exhausted. Not wishing to wait for the money, and believing its First

Amendment rights were violated, the LNC brought a declaratory action under what is now codified at 52 U.S.C. § 30110, whereby district courts find facts and certify constitutional challenges to federal election laws, for initial decision by the en banc circuit.

Judge Wilkins certified an as-applied challenge for the en banc D.C. Circuit's decision. *Libertarian Nat'l Comm., Inc.* v. *FEC*, 930 F. Supp. 2d 154 (D.D.C. 2013), *reconsideration denied*, 950 F. Supp. 2d 58 (D.D.C. 2013). Just as the case arrived at the circuit court, the escrow funds were exhausted, and the FEC argued the case had become moot. Notwithstanding factual findings that the LNC solicits bequests, 930 F. Supp. 2d at 174 (facts 22 and 23); that the LNC regularly receives bequests, *id*. at 182 (fact 69); that political parties generally receive bequests, *id*. at 183 (facts 72 and 73); and that "many bequests of amounts far exceeding FECA's annual contribution limit . . . have been left for national party committees in recent years," *id*. at 184 (fact 78); *see generally* facts 76-86, the FEC confidently predicted that "there is no reasonable expectation that the Contribution Limit will restrict a bequest to the LNC again." Suggestion of Mootness, *Libertarian Nat'l Comm.* v. *FEC*, D.C. Cir. No. 13-5088, at 7 (Feb. 3, 2014).

The D.C. Circuit agreed with the FEC and dismissed the case as moot. *Less than  five months later*, another gentleman died and left the LNC $235,575.20, leading the parties and this Court to wrestle with another certified election case, on many of the same grounds. *Libertarian Nat'l Comm., Inc.* v. *FEC*, No. 18-5227, 2019 U.S. App. LEXIS 14964, 2019 WL 2180336 (D.C. Cir. May 21, 2019) (en banc). Atlas submits that a third government shutdown of the COLA process may well occur sooner than a third six-figure bequest to the LNC in roughly the same timeframe. It would be most prudent to see this case through on the merits now, rather than later.

CONCLUSION

The motion to dismiss should be denied.

Dated:  June 10, 2019                    Respectfully submitted,

                                         Alan Gura (D.C. Bar No. 453449)
                                         Gura PLLC
                                         916 Prince Street, Suite 107
                                         Alexandria, VA 22314
                                         703.835.9085/Fax 703.997.7665


                              By:  /s/ Alan Gura
                                   Alan Gura

                                   Attorney for Plaintiff Atlas Brew Works LLC