**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| **ATLAS BREW WORKS, LLC**, |
| Plaintiff, |
| v. |
| **WILLIAM P. BARR, in his official capacity as Attorney General of the United States**, |
| Defendant. |

Case No. 19-cv-79 (CRC)

## MEMORANDUM OPINION

The 34-day government shutdown that began in December 2018 and ran through most of January 2019 disrupted the lives of hundreds of thousands of federal employees and countless others who depend on their services. Families missed paychecks, furloughed workers were forced to moonlight, and critical public functions were curtailed after unpaid civil servants called in sick. All of those effects were entirely predictable. But the shutdown also had myriad other, more surprising consequences. One of them even threatened the country's most treasured libation: beer. This case shows how.

Under federal law, any brewer who wishes to ship an alcoholic beverage in interstate commerce must first submit for regulatory approval the labels it will affix to its containers. If a brewer forgoes the pre-approval process and ships a container anyway, it risks criminal prosecution. The government shutdown, however, effectively put the regulator out of business, stalling the approval process for any labels already in the pipeline. District of Columbia-based craft brewer Atlas Brew Works had a few such labels, including one for a perishable pale ale, "The Precious One," that Atlas had already brewed. Without label approval, The Precious One sat waiting in an Atlas fermenting tank, rather than flowing freely at area watering holes. This

pinched the company's bottom line and left its expectant customers in the lurch. But it also, Atlas said, constituted a First Amendment violation: a law that prohibits speech without regulatory approval becomes an outright ban on speech when the approval process is shuttered. As Atlas puts it, "[i]t cannot be denied the right to speak for lack of meeting an impossible condition." Am. Compl. at 2.

So Atlas filed suit on January 15, 2019—24 days into the shutdown. It sought a temporary restraining order and preliminary injunction preventing the Justice Department from prosecuting Atlas for proceeding with its labels without pre-approval. See ECF No. 3. Given Atlas's request for expedited review, the Court ordered the government to promptly reply and held a hearing on the matter. Within days of that hearing, the Court was poised to issue a ruling.

But then, on January 25, the shutdown ended. Just a few days later, The Precious One label was approved, and Atlas was once again able to speak via its beer labels without the fear of prosecution. With Atlas no longer suffering an immediate and potentially irreparable injury, the Court denied as moot Atlas's motion for a temporary restraining order and preliminary injunction. See Order, ECF No. 13. The government asked the Court to go a step further, dismissing the entire case as moot. Atlas countered that the case was not moot and, in any event, that it fit within the capable-of-repetition-yet-evading-review exception to the ordinary mootness rule. It argued that another shutdown would likely come, and that when it did, Atlas would suffer a similar injury. The Court reserved judgment on that question and ordered the parties to fully brief it. Id.

The government has since followed up with a motion to dismiss focused exclusively on the mootness question. Because the shutdown that started this dispute has ended and the

likelihood of the same injury recurring is too speculative, the Court finds the case moot and will grant the government's motion.

**I.    Background**

A.  Statutory Framework

This case involves the interplay of two fields of federal law—one governs how the federal government can spend money, the other regulates how purveyors of alcoholic beverages can label their products.  The Court will say a bit about each before turning to the facts at hand.

*1.   The Appropriations Clause and Anti-Deficiency Act*

Congress, per the Constitution's Appropriations Clause, holds "exclusive power over the federal purse."  Rochester Pure Waters Dist. v. EPA, 960 F.2d 180, 185 (D.C. Cir. 1992); see U.S. Const., art. I, § 9, cl. 7 ("No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law.").  The Constitution thereby "prevents Executive Branch officers from even inadvertently obligating the Government to pay money without statutory authority."  U.S. Dep't of Navy v. Fed. Labor Relations Auth., 665 F.3d 1339, 1347 (D.C. Cir. 2012).  "Federal statutes reinforce Congress's control over appropriated funds."  Id.  Key among these statutes is the Anti-Deficiency Act ("ADA"), 31 U.S.C. §§ 1341–42, which "makes it unlawful for government officials to 'make or authorize an expenditure or obligation exceeding an amount available in an appropriation,'" U.S. Dep't of Navy, 665 F.3d at 1347 (quoting 31 U.S.C. § 1341(a)(1)(A)).  The ADA also prohibits any federal officer or employee from working without an appropriation "except for emergencies involving the safety of human life or the protection of property."  31 U.S.C. § 1342.

2.   *The Regulation of Alcohol Labels*

The Federal Alcohol Administration Act ("FAA Act"), 27 U.S.C. § 201 *et seq.*, regulates the content of labels affixed to malt beverages shipped in interstate commerce.  It requires or forbids various types of speech on the labels and makes it a crime to introduce into interstate commerce any beverage that is not "bottled, packaged, and labeled in conformity with" regulations established by the Secretary of the Treasury.  27 U.S.C. § 205(e).  Those regulations prohibit false, misleading, and obscene statements, and statements that disparage competitors' products.  Id.  They also require that labels contain certain other information, including the beverage's manufacturer, identity, and net contents.  Id.; 27 C.F.R. Part 7.

To facilitate compliance with these regulations, the FAA Act created a regulatory process that requires sellers to obtain a Certificate of Label Approval ("COLA") attesting to a label's conformity with the Act and its attendant regulations *before* shipping a product in interstate commerce.  27 U.S.C. § 205(e).  A Treasury regulation provides likewise.  27 C.F.R. § 7.41(a).  An entity within the Treasury—the Alcohol and Tobacco Tax and Trade Bureau ("TTB")— administers the FAA Act, including the COLA requirement.  The Attorney General of the United States is authorized "to prevent and restrain violations of" the FAA Act.  27 U.S.C. § 207.  Shipping beer in interstate commerce without a COLA, in violation of 27 U.S.C. § 205, is a misdemeanor punishable by a fine up to $1,000 per offense.  Id. § 207.

B.  Factual Background

On November 28, 2018, Atlas sought a COLA for a label that would adorn individual cans of The Precious One.  See Mot. for TRO, Ex. 2, ECF No. 3-2.  The TTB approved that COLA on December 17, 2018.  Then, on December 20, Atlas sought a COLA for a "keg collar"

label for the same beer.  Am. Compl. ¶ 29.[1]  But just two days later, appropriations lapsed for scores of government agencies, including the TTB, which had not yet acted on Atlas's COLA application for The Precious One's keg collar label.  Id.  The TTB's home page informed visitors that the appropriations lapse had led to a "cessation of TTB operations with limited access to" its web site.  Id. ¶ 26.  The TTB web site also stated that COLA "submissions will not be reviewed or approved until appropriations are enacted."  Id.

The TTB's closure put Atlas over a barrel.  Id. ¶¶ 33–35.  The Precious One is perishable, and Atlas intended to market it as a seasonal beer February through April.  Id. ¶ 34.  But without label approval, Atlas said all of the beer set aside for out-of-state distribution via its kegs was languishing in a fermenting tank.  Id.  Atlas feared that it would lose thousands of dollars if the shutdown persisted much longer, and it lamented the opportunity cost incurred by the tying up of one of its fermenting tanks.  Id. ¶¶ 34–35.[2]

To put an end to the stalemate, Atlas on January 15, 2019 filed suit and sought a temporary restraining order and preliminary injunction against then-Acting Attorney General Matthew Whitaker.[3]  See ECF No. 3.  The temporary restraining order would have enjoined the government from prosecuting Atlas for proceeding with The Precious One keg collar label without a COLA, while the preliminary injunction would have applied more broadly to all of Atlas's pending COLA applications and perhaps even to other brewers nationwide.  See id.  The

---

[1] The keg collar label is affixed to the top of a keg encircling the tap coupler.

[2] In Atlas's amended complaint, it explains that a "similar problem affected [it] with respect to The Shape of Funk to Come," another beer whose "production was completed during the shutdown while its keg colar COLA application languished."  Am. Compl. ¶ 34.

[3] Given the confirmation of William P. Barr as Attorney General, he is now the appropriate Defendant in this case.

Court ordered the government to file an opposition by January 18, <u>see</u> Minute Order, Jan. 15, 2019, and held an expedited hearing on the motion four days later, <u>see</u> Minute Entry, Jan. 22, 2019.

But on January 25, before the Court had issued a ruling on the motion, leaders in Washington announced that a deal had been reached to restore appropriations. The Court held a status conference the following Monday to discuss whether Atlas's demands had been mooted by the end to the shutdown. <u>See</u> Minute Order, Jan. 27, 2019. Atlas argued that its request for emergency injunctive relief had not yet been mooted because the TTB had not yet approved The Precious One label. The government, for its part, assured the Court that the approval was imminent. The Court thus deferred ruling on the matter until the government had provided notice that the label had been approved. That notice came the next day, <u>see</u> Notice of Label Approval, ECF No. 12, and the Court proceeded to deny as moot Atlas's motion for a temporary restraining order and a preliminary injunction, <u>see</u> Order, ECF No. 13. The Court did not, however, dismiss the entire case as moot, instead inviting the government to submit an answer or revised motion to dismiss regarding Atlas's demand for declaratory relief. <u>See id.</u>

The government, on February 28, filed its motion to dismiss. <u>See</u> Motion to Dismiss for Lack of Jurisdiction ("MTD"), ECF No. 14. Two weeks later, Atlas opposed that motion, but it also amended its complaint. <u>See</u> Amended Complaint, ECF No. 19; Memorandum in Opposition, ECF No. 20. The parties thereafter agreed to reset the briefing schedule, this time focused on the new allegations in the amended complaint. <u>See</u> Joint Motion for Briefing Schedule, ECF No. 21. The motion has now been fully briefed, and it is ripe for the Court's resolution.

## II.   Legal Standard

The government has filed a motion to dismiss Atlas's complaint as moot, which "is properly brought under [Federal Rule of Civil Procedure] 12(b)(1) because mootness itself deprives the court of jurisdiction."  Indian River Cty. v. Rogoff, 254 F. Supp. 3d 15, 18 (D.D.C. 2017).  "Unlike some jurisdictional questions such as standing or ripeness, the party asserting mootness . . . bears the 'initial heavy burden' of establishing that the case is moot."  Zukerman v. USPS, -- F. Supp. 3d --, No. 15-cv-2131, 2019 WL 1877173, at *4 (D.D.C. Apr. 26, 2019) (quoting Honeywell Int'l, Inc. v. NRC, 628 F.3d 568, 576 (D.C. Cir. 2010)).  When evaluating a motion to dismiss, "the Court must treat the complaint's factual allegations as true and afford the plaintiff the benefit of all inferences that can be derived from the facts alleged."  Indian River Cty., 254 F. Supp. 3d at 18 (internal quotation marks omitted).  "But because the Court has an 'affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority,'" id. (quoting Grand Lodge of Fraternal Order of Police v. Ashcroft, 185 F. Supp. 2d 9, 13 (D.D.C 2001)), the '[p]laintiff[s'] factual allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion [for failure to state a claim],'" id. (quoting Delta Air Lines, Inc. v. Export–Import Bank of United States, 85 F. Supp. 3d 250, 259 (D.D.C. 2015)).  In addition, the Court "may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction."  Id. (internal quotation marks omitted).

## III.   Analysis

The government contends that the case has been mooted by the restoration of appropriations and the processing of Atlas's labels.  Atlas responds, first, that the case has not been mooted and, second, that, even if it has been, the underlying dispute is capable of repetition

yet will evade judicial review, meaning that the Court should still resolve it.  The Court takes these issues in turn.

A.  <u>Mootness</u>

"Federal courts lack jurisdiction to decide moot cases because their constitutional authority extends only to actual cases or controversies."  <u>Iron Arrow Honor Soc'y v. Heckler</u>, 464 U.S. 67, 70 (1983).  The Constitution's case or controversy requirement "means that, throughout the litigation, the plaintiff must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision."  <u>Spencer v. Kemna</u>, 523 U.S. 1, 7 (1998) (internal citations and quotation marks omitted).  "A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III—'when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome.'"  <u>Already, LLC v. Nike, Inc.</u>, 568 U.S. 85, 91 (2013) (quoting <u>Murphy v. Hunt</u>, 455 U.S. 478, 481 (1982) (per curiam)).  "An intervening event may render a claim moot if there is no reasonable expectation that the conduct will recur."  <u>Leonard v. U.S. Dep't of Defense</u>, 38 F. Supp. 3d 99, 104 (D.D.C. 2014) (citing <u>Pharmachemie B.V. v. Barr Labs., Inc.</u>, 276 F.3d 627, 631 (D.C. Cir. 2002)).

The government contends that the end of the government shutdown functioned as such an intervening event here.  It says Atlas's claims "seek to challenge actions that are only present and relevant during a speculative future lapse in government appropriations."  Mem. Supp. Mot. Dismiss ("MTD"), ECF No. 23, at 13.  For proof, the government continues, look no further than Atlas's amended complaint.  <u>See</u> <u>id.</u> at 13–14.  Paragraph 38, for example, reads: "When, as a matter of law, no mechanism exists by which brewers might obtain [COLAs] . . . ."  Likewise, Paragraph 39, starts: "From time to time, no COLA issuance mechanism can function . . . ."  And

finally, Paragraph 42 persists with the theme: "[T]his prior restraint is unbounded as to time whenever the government suspends the operation of the COLA process . . . ." Because Atlas frankly acknowledges that the harm they fear is only a future one, the government says the case no longer involves a live, *i.e.* ongoing, controversy and should therefore be dismissed.

Atlas begs to differ. It insists that its declaratory judgment action challenges an ongoing policy, not merely a one-time event. <u>See</u> Memorandum in Opposition ("Opp."), ECF No. 24, at 19 ("The end of an injury inflicted under a challenged policy does not moot a challenge to the injurious policy."). Atlas says the declaratory judgment claim cannot be moot because it is a "challenge to the Attorney General's existing enforcement policy"—punishing brewers for proceeding without a COLA despite the TTB's inability to process COLA applications—not to any single action based on that policy. <u>Id.</u> Atlas's amended complaint indeed reflects this approach. <u>See</u> Am. Compl. ¶ 40 ("Defendant maintains a policy of enforcing the COLA requirement against unlicensed speech, notwithstanding the lack of a COLA function stemming from these budgetary constraints."). And, as Atlas points out, D.C. Circuit case law recognizes that, where "a plaintiff challenges both a specific agency action and the policy that underlies that action, the challenge to the policy is not necessarily mooted merely because the challenge to the particular agency action is moot." <u>City of Houston v. Dep't of Housing & Urban Dev.</u>, 24 F.3d 1421, 1428 (D.C. Cir. 1994); <u>accord</u> <u>Del Monte Fresh Produce Co. v. United States</u>, 570 F.3d 316, 321 (D.C. Cir. 2009) ("[A] plaintiff's challenge will not be moot where it seeks declaratory relief as to an ongoing policy.").

The trouble with Atlas's argument, however, can be found in the portions of <u>City of Houston</u> it chose not to quote. Right after the D.C. Circuit said that challenges to a policy may persist even where actions based on that policy are no longer at issue, it discussed the genesis of

9

that rule in general and the Supreme Court's decision in <u>Super Tire Engineering Co. v.</u>

<u>McCorkle</u>, 416 U.S. 115 (1974), in particular:

> In <u>Super Tire</u>, the Supreme Court held that because the strike that prompted that suit ended before the case could be resolved, the employer's request for an injunction preventing payment of welfare benefits during the strike was moot. However, the Court observed that the employer's request for declaratory relief was not moot, because its subsequent relations with the union would be affected by the ongoing state policy of providing public assistance to strikers, and because the challenged law was in no way contingent or subject to the discretion of an enforcing body, but was fixed and definite.

<u>Id.</u> at 1428–29 (internal citations and quotation marks omitted).

The Circuit's reading of <u>Super Tire</u> highlights two critical differences between that case and this one.  First, the policy in <u>Super Tire</u>—that striking workers engaged in labor disputes would be eligible for state assistance benefits—allegedly injured the corporate plaintiffs regardless whether a strike was actually occurring.  416 U.S. at 124.  Because "[e]mployees know that if they go out on strike, public funds are available," the Supreme Court explained, "this eligibility affects the collective-bargaining relationship, both in the context of a live labor dispute when a collective-bargaining agreement is in process of formulation, and in the ongoing collective relationship[.]"  <u>Id.</u>  As a result, whether workers were actively receiving state benefits during a strike was almost besides the point; the state's policy was "a factor lurking in the background of every incipient labor contract."  <u>Id.</u>  Second, and related to the first point, the effect of the policy was "not contingent upon executive discretion."  <u>Id.</u>  That the state may for some reason choose not to award benefits to some striking workers made no difference to the corporate plaintiffs, because it "[was] the basic eligibility for assistance that allegedly prejudices [their] economic position."  <u>Id.</u> at 124 n.8.  As a consequence, the challenged policy, at least according to the plaintiffs, was "immediately and directly injurious to [their] economic positions."  <u>Id.</u> at 125.

Here, by contrast, Atlas has never argued that the mere *prospect* of a government shutdown and the potential for prosecution were it to ship its products in interstate commerce without a COLA has a *present* effect on its First Amendment rights. Exactly how that argument would play out, had Atlas endeavored to make it, is beyond the Court's analysis. Moreover, whether Atlas would be affected by the "policy" it identifies—the Attorney General's purported plan to prosecute COLA violators during a shutdown—*would* depend on executive discretion at several junctures. To take just one example (and more will be said on this later), a future appropriations lapse would have to impact the Treasury, and the TTB specifically, in the same way that it did this last go-round. If the TTB, for some reason, did not shutter its operations and continued processing COLA applications, the so-called policy Atlas challenges would not even be implicated. The "threat of governmental action," therefore, is at least "two steps removed from reality," just like the precedents that the Super Tire majority distinguished. Id. at 123.

The takeaway is clear. While a plaintiff's challenge to a policy may not always be mooted by the absence of a discrete application of the policy, that is true only where the policy is fixed and definite and manages to work a present injury on the plaintiffs. See Super Tire, 416 U.S. at 125–26 ("It is sufficient . . . that the litigant show the existence of [a] . . . policy that has adversely affected and continues to affect a present interest."). That was the factual basis for Super Tire's holding, see id. at 123–26, and the D.C. Circuit has always understood its holding as tethered to those facts, see City of Houston, 24 F.3d at 1428–29 (emphasizing that Super Tire's holding depended on ongoing impact of state law); Del Monte Fresh Produce Co., 570 F.3d at 321 (discussing Super Tire's finding that state law was "immediately and directly injurious" to plaintiffs); Halkin v. Helms, 690 F.2d 977, 1008 (D.C. Cir. 1982) (explaining that Super Tire's holding "rested . . . on its finding that the governmental policy challenged . . . was

one essentially carved in stone and self-executing in nature"). Try as it might, Atlas cannot sever Super Tire's principles from its factual moorings.

In sum, Atlas's failure to demonstrate that DOJ's alleged enforcement policy operates independent of executive discretion and that the policy causes Atlas to suffer any present harm renders its demand for declaratory relief moot. That finding divests this Court of jurisdiction over the case, unless Atlas can show that an exception to the mootness doctrine applies. The Court now turns to that issue.

B.  Exception to Mootness: Capable of Repetition yet Evading Review

An otherwise moot case may be salvaged if one of the exceptions to mootness applies. While the government, as the party seeking dismissal for lack of jurisdiction, bore the burden of establishing that Atlas's claims had been mooted by the restoration of appropriations, it is now Atlas, as the party opposing dismissal, that "bears the burden of proving an exception applies." J.D. v. Azar, 925 F.3d 1291, 1307 (D.C. Cir. 2019).

The mootness exception Atlas grasps for here applies to claims that are capable of repetition but evade judicial review. The "capable-of-repetition doctrine applies only in exceptional situations," City of Los Angeles v. Lyons, 461 U.S. 95, 109 (1983), and only where the plaintiff can "demonstrate that '(1) the challenged action is in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party would be subjected to the same action again,'" Del Monte Fresh Produce Co., 570 F.3d at 322 (quoting Clarke v. United States, 915 F.2d 699, 704 (D.C. Cir. 1990) (en banc)). Because the Court concludes Atlas cannot satisfy the second necessary condition, it begins and ends its analysis there.

The "capable of repetition" prong "requires that the same parties will engage in litigation over the same issues in the future."  United Bhd. of Carpenters & Joiners of Am., AFL-CIO v. Operative Plasterers' & Cement Masons' Int'l Ass'n of U.S. & Canada, AFL-CIO, 721 F.3d 678, 688 (D.C. Cir. 2013) (internal quotation marks omitted).  The party invoking the exception "must show a reasonable degree of likelihood that the" issues will recur.  Id. (internal quotation marks omitted); see also Del Monte Fresh Produce Co., 570 F.3d at 324 (plaintiff must demonstrate that "legal wrong complained of by the plaintiff is reasonably likely to recur").

What exactly does a "reasonable degree of likelihood" mean?  Though judgment calls are inevitable when working with slippery standards like this, the Supreme Court has provided some guidance.  In Murphy v. Hunt, the Court said the appropriate question is whether there is a "'reasonable expectation' or a 'demonstrated probability'" of recurrence.  455 U.S. at 482 (quoting Weinstein v. Bradford, 423 U.S. 147, 149 (1975)).  That dual formulation occasioned a debate six years later in Honig v. Doe, 484 U.S. 305 (1988), over whether "reasonable expectation" and "demonstrated probability" were two ways of saying the same basic thing, or instead referred to two distinct quantums of probability.  Compare id. at 318 n.6 (maj. op.), with id. at 333 (dis. op.).  In dissent, Justice Scalia took the former view, arguing that a "reasonable expectation" of recurrence could exist only if there were a "demonstrated probability" of such a recurrence, for "[n]o one expects that to happen which he does not think probable; and his expectation cannot be shown to be reasonable unless the probability is demonstrated."  Id. at 333.  To the majority's eye, however, the use of "or" between the two standards proscribes a reading that merely equates them.  Id. at 318 n.6.  And to the extent the dissent believed a clear more-likely-than-not showing was required, the majority found that inconsistent with the Court's

cases.  Id. (citing cases for the proposition that the exception has applied to disputes that "were hardly demonstrably probable").

Thus, the Court will not ask "whether [Atlas] has established with mathematical precision the likelihood" that a future government shutdown will inhibit its exercise of First Amendment rights.  Id.  Nor will it ask "whether [Atlas] ha[s] demonstrated that a recurrence of the dispute [is] more probable than not."  Id.  Instead, it will ask only whether there is a "reasonable expectation" of such recurrence.  Id.  Though this standard is certainly more forgiving than a strict probability rule, it by no means admits all comers.  As the Supreme Court has long maintained, "a mere physical or theoretical possibility" will not be enough.  Murphy, 455 U.S. at 482; see also Clarke, 915 F.2d at 701 (parties must show that resolution of the case would have "a more-than-speculative chance of affecting [their rights] in the future" to avoid mootness).

The task to which the Court now turns, then, is determining where on the continuum between "reasonable expectation" of recurrence and "mere . . . possibility" of recurrence the First Amendment dispute in this case falls.  The government contends that there are too many hypothetical events that would have to coincide for this case to count as reasonably likely to recur.  In its view, at least four events would have to occur—at the same time—for the alleged wrong Atlas suffered during the last government shutdown to recur.  MTD at 18, 20.  Three are out of Atlas's hands altogether; the last would depend on what Atlas does, and when it does it. The first three are that another appropriations lapse would have to occur, that lapse would have to affect the Treasury, and the Treasury would have to respond to the lapse in the same way it did during the last shutdown.  As for what Atlas must do for this grievance to recur, it must seek a COLA approval either right before the shutdown begins or while it is ongoing.  The government

says there is no reasonable expectation that each of those contingencies will be satisfied simultaneously.

The Court agrees.  Closer examination of each of the contingencies, with relevant case law providing a useful barometer, confirms that Atlas's capable-of-repetition argument is more conjecture than reasonable expectation.

### 1.  The Contingencies

*A shutdown has to occur*.  At first blush, this contingency seems like the surest bet for Atlas.  After all, as Atlas documents, there have been 20 federal "funding gaps" since FY 1977.  See Opp., Ex. B, Congressional Research Service, Federal Funding Gaps: A Brief Overview (February 4, 2019) ("Opp., Ex. B"), ECF No. 24-3, at 2.  But Atlas must point to more than just a lapse in appropriations or "funding gap."  It needs a lapse that actually results in a government shutdown, and that shutdown must last long enough to hinder the processing of one of Atlas's COLA labels.  Yet about half of the 20 funding gaps that have occurred since FY 1977 were so brief—three days or fewer in duration—that they "do not appear to have resulted in a 'shutdown'" at all.  Id.  And while the most recent lapse caused a shutdown that lasted 34 days, that was the longest by 13 days; only seven of the 20 shutdowns have lasted 10 or more days, and only two have stretched beyond 20.  Id. at 6.

Even so, the Court agrees with Atlas that there is at least a "reasonable expectation" that a shutdown will occur again in the foreseeable future.  Murphy, 455 U.S. at 482.  There have been two extended funding gaps in this decade alone—16 days in 2013 and 34 days in 2018–19—and this nation's otherwise long history of budget impasses indicates still more lie ahead.  Satisfying this threshold contingency, however, takes Atlas's capable-of-repetition argument only so far.

*The shutdown has to affect the Treasury Department, and Treasury must shutter the TTB.* The Court takes the next two contingencies together.  Even assuming a future appropriations lapse is likely to recur, the lapse would have to affect the Treasury Department, and Treasury would have to respond to a funding gap in the same way it did the last time around.  As the government explains, "[n]ot all lapses in appropriations necessarily affect all agencies."  MTD at 18; see also Opp., Ex. B at 4 ("[W]hen most of these funding gaps occurred, one or more regular appropriations measures had been enacted, so any effects were not felt government-wide.").  The government notes that "this past lapse in appropriations affected only some agencies, as five of the twelve appropriations bills had already been enacted by the time the lapse began."  Id.; see also Opp., Ex. B at 2.  Similarly, Congress had passed seven of thirteen appropriations bills before the 1995–96 shutdown.  Opp., Ex. B at 2.  Thus, even granting that a lapse in appropriations will happen again, that by itself does not guarantee the Treasury Department will be affected.

That's not all.  Even if the lapse affects Treasury's appropriation, the government says "it is entirely speculative whether, in response to any such lapse, the Department of Treasury would implement the same contingency plan in exactly the same manner."  MTD at 19.  The orders from on high, from the Office of Management and Budget, may change.  Id.  The Treasury may undergo structural changes, affecting its "underlying programs, governing legal authorities, or employment relationships."  Id.  It could also find itself with some rainy-day funding "such that it may continue a program even in the absence of appropriated funding."  Id.  Or, the Treasury "may simply exercise its discretion under the Anti-Deficiency Act in a different manner."  Id.

Atlas calls this "irresponsible speculation."  Opp. at 29.  It notes, first and foremost, that notwithstanding the government's hand-waving about the Treasury being immune from a future

16

funding lapse, the fact is that twice in the last six years, a shutdown has hit Treasury, and twice the TTB has stopped processing COLA applications.  Id.  Atlas doubts the government's argument that, even if Treasury is affected, it might handle the appropriation lapse differently.  Of the government's "mights," Atlas says, "by the next shutdown, the FAA Act might be repealed, or Prohibition might be reintroduced.  Or, perhaps, given that First Amendment rights are at stake, the government will make better decisions.  *Anything is possible*.  No relief can be had against the wrongdoer, because it might change its mind."  Id.  Rather than indulge the government's "string of conjecture," id. at 28, Atlas asks the Court to assume the Treasury would do as it did during the last shutdown and stop processing COLA applications.

Hyperbole aside, *both* sides are engaged in a guessing-game.  It is true that the TTB stopped processing COLA applications during the last shutdown, but it is equally true that not all appropriations lapses, including the last one, affect all federal entities, and that Treasury remains free to tinker with its response to a future shutdown, see Reply to Opposition ("Reply"), ECF No. 26, at 6 (citing OMB guidance stating that requires agencies "to re-evaluate and update their contingency plans").  Atlas may doubt the government's sincerity that it would behave any differently during a future shutdown, but the reality is that the government *could* do so—and that reality is yet another contingency that lessens the likelihood that the First Amendment injury Atlas allegedly suffered here will recur.

In a footnote, Atlas contends that the "mere promise to reform, without more, is worthless for mootness purposes."  Opp. at 30 n.2.  But as counsel for Atlas surely understands, the cases Atlas cites in support of that proposition all involve the voluntary-cessation exception to mootness, not the capable-of-repetition exception.  These are two discrete analytical frameworks.  The former holds that a defendant cannot unilaterally moot a case simply by

ceasing his current conduct, because that would "leave the defendant free to return to his old ways." United States v. Concentrated Phosphate Export Ass'n, 393 U.S. 199, 203 (1968) (alterations and internal quotation marks omitted).  Some additional showing is required to moot the case.  In some cases, "subsequent events" may make "it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." Id.  Short of that, a defendant bears "the heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to start up again." PETA v. USDA, 918 F.3d 151, 157 (D.C. Cir. 2019) (alteration and internal quotation marks omitted).  As the D.C. Circuit recently explained, a government agency might make such a showing by submitting a sworn declaration that states, in no uncertain terms, that the agency will not again engage in the allegedly offending conduct.  Id. at 157–58. These declarations will suffice, however, only where they announce a "new permanent policy" consistent with a plaintiff's demands, establish "no real prospect" of repetition, or "formally announce[] changes to official governmental policy."  Id. at 159 (citations omitted).  Atlas is of course correct that the government's mere suggestion in this case that the Treasury might handle the next shutdown differently does none of those.

But that is not the issue that confronts the Court.  This case involves the capable-of-repetition exception to mootness, and that means it is *Atlas*'s burden to show that the conduct it complains about here is *likely* to recur, not the government's to show it *absolutely cannot* recur. However "worthless" the mere prospect of reform might be for purposes of the voluntary-cessation exception, that prospect provides still further reason to doubt that the injury that spawned this case will recur.

*Atlas would have to seek a COLA immediately before a shutdown began, or during it*. That leaves one final hurdle to this dispute's recurrence.  Even if a lapse in appropriations

18

occurs, even if the lapse affects the Treasury Department, even if the shortfall persists long enough to cause a shutdown of Treasury's operations, and even if Treasury responds to the shutdown by ceasing COLA processing, Atlas has to hold up its end of the bargain: it must have a COLA application that needs processing at the time all of the above events occur.  The TTB's track record reveals that it processes COLA applications rather quickly; although processing time fluctuates, it appears to take TTB about two to three weeks to approve or deny a COLA application.  See Declaration of Janet M. Scalese ("Scalese Decl."), ECF No. 14-1,[4] ¶ 4 (average processing time of 18 calendar days for malt beverages in February 2019); Alcohol and Tobacco Tax and Trade Bureau, "Processing Times for Label Applications" (July 22, 2019), https://www.ttb.gov/labeling/processing-times.shtml (average processing time of 24 calendar days on July 22, 2019).  Thus, if Atlas does not file a COLA application close in time to when a future shutdown begins, or file one during the pendency of the shutdown, its First Amendment rights still would not be implicated.

Atlas tries hard to minimize this contingency.  It maintains that it "applies for COLAs at a rate of one every 11 days, and it takes approximately 3 weeks to process a COLA."  Opp. at 28; see Declaration of Justin Cox ("Cox Decl."), ECF No. 24-1,[5] ¶ 9 (stating Atlas applied for 34 COLAs in 2018).  Given those numbers, Atlas says it "almost always needs at least one COLA" and "there is all but a mathematical certainty that a COLA shutdown will leave at least one of Atlas's applications hanging."  Id.  The Court sees it differently.

_____

[4] The government provided Scalese's declaration along with its February 28, 2019 motion to dismiss the original complaint, but cites it for support in its operative motion to dismiss.

[5] Atlas has provided several declarations by Mr. Cox, but this opinion references only the one filed along with Atlas's opposition to the operative motion to dismiss.

First of all, while the Court does not doubt that Atlas sought 34 COLAs in 2018, the brewer's every-11-days statistic is misleading. Atlas arrived at that number by dividing 365 by 34, but Atlas's own declaration makes clear that Atlas seeks COLAs in fits and spurts, not at regular intervals throughout the calendar year. For example, Atlas applied for three other COLAs on the same day it applied for The Precious One COLA that precipitated this case. See Cox Decl. ¶ 16; Cox Decl., Ex. A., ECF No. 24-2, at 3. It applied for another six COLAs on the same day, December 11, 2018. See Cox Decl., Ex. A at 2–3. The brewer's lumpy application pattern meant that it had long dry spells in 2018 without having a single COLA pending— including for 34 days (coincidentally, the same length of the recent record shutdown) from February to March, id. at 2 (rows 52–53), and for 55 days from April to May, id. (rows 54–55). It should therefore come as no surprise that, when the government filed its initial motion to dismiss on February 26, 2019, Atlas had no pending COLA applications, and indeed did not file another until March 12, 2019. Id. at 3 (rows 80, 87). These facts belie Atlas's contention that "there is all but a mathematical certainty that a COLA shutdown will leave at least one of [its] applications hanging." Opp. at 28.

In addition, the relatively brief duration of most appropriations lapses, combined with the short time it takes TTB to process a COLA application, also lessens the likelihood that an Atlas COLA application will be left at sea during a hypothetical shutdown. Funding gaps, as the Court highlighted earlier, are historically very short—so short, in fact, that they often do not cause a "shutdown" at all. See Opp., Ex. B, at 2, 5. Even when a shutdown does occur, it has rarely stretched beyond a week or two. Id. And because the TTB processes COLAs so quickly—about two to three weeks—that means Atlas must file for a COLA within about 20 days of a shutdown's onset for that COLA's processing to be affected and for Atlas's alleged First

Amendment injury to arise.  <u>See</u> Scalese Decl. ¶ 4.  True, Atlas could also file for a COLA *after* a shutdown has begun, but there again, the short duration of shutdowns makes that a slim possibility.  (Unless, of course, Atlas were to deliberately wait to file a COLA until a shutdown has begun, about which more will be said later.)

*      *      *

To recap the boxes that must be checked for this dispute to recur: a lapse in appropriations must happen; the lapse must affect the Treasury Department; the lapse must last long enough to actually cause a shutdown; Treasury must respond to the shutdown by shuttering the TTB's COLA processing; and Atlas must have a COLA application pending at the time the shutdown begins or file one shortly thereafter.  In the Court's view, the combination of these contingencies takes this case beyond the limits of the capable-of-repetition exception to mootness.  The Court grants that, if only two or three of these events had to coincide for the alleged wrong to recur, the Court would be facing a different question and might well come to a different conclusion.  For it is not hard to imagine another appropriations lapse causing a government shutdown, just as it is easy to predict that Atlas will continue to need COLAs so long as it remains in business.  But this case will not again present a live controversy unless each and every potentiality discussed here happens, and happens at the right time.  Stretching the capable-of-repetition exception to cover this chain of contingencies would permit the exception to swallow the rule.

### 2. *The Case Law*

The cases discussed by the parties confirm the conclusion that Atlas's claim is moot, and that there is not a "reasonable expectation" that the alleged legal wrong giving rise to the claim will recur.

21

A natural place to start is with Judge Huvelle's decision in <u>Leonard v. U.S. Dep't of Defense</u>, 38 F. Supp. 3d 99 (D.D.C. 2014), which arose out of the 2013 shutdown and involved, like this case, an alleged First Amendment violation.  The plaintiff, Father Ray Leonard, worked as a Catholic chaplain at the naval submarine base in Kings Bay, Georgia.  When the government shut down, Father Leonard was told that he could not perform his "ecclesiastical duties, even voluntarily," which Leonard said violated his rights under the First Amendment and the Religious Freedom Restoration Act ("RFRA").  <u>Id.</u> at 102.  One day after Father Leonard filed suit, in which he sought both injunctive and declaratory relief, the defendants told him that "he (and other chaplains like him) would be permitted to continue working during the shutdown." <u>Id.</u>  After the shutdown ended and the Defense Department moved to dismiss the suit as moot, Father Leonard contended, among other things, that the First Amendment injury he suffered fit into the capable-of-repetition exception to mootness.

Judge Huvelle disagreed.  She reasoned that "there are simply too many contingencies that would need to occur simultensouly" to be capable of repetition, namely:

> (1) the government would need to shut down once again, (2) it would need to exclude payment for chaplains from any temporary funding schemes; (3) Father Leonard, who works on year-to-year contracts, would need to continue to serve at the Naval Submarine Base Kings Bay as a chaplain, and (4) the Navy would need to apply the Anti-Deficiency Act so as to limit chaplains' religious activities despite the express decision not to do so at the end of the most recent government shutdown.

<u>Id.</u> at 106.  The D.C. Circuit seconded that analysis in an unpublished opinion, emphasizing that Father Leonard's capable-of-repetition argument failed to clear even the first contingency. <u>Leonard v. U.S. Dep't of Defense</u>, 598 F. App'x 9, 10 (D.C. Cir. 2015) ("[Leonard's] claims do not qualify for the capable-of-repetition, yet-evading-review exception to the mootness doctrine

because the likelihood of a future government shutdown is too speculative." (internal quotation marks omitted)).

The parties spar over <u>Leonard</u>'s relevance to this case. The government calls it "[t]he most relevant precedent directly on point," MTD at 21; Atlas says it is "readily distinguishable" and thus "unavailing," Opp. at 32. The key distinction, according to Atlas, is the fourth contingency highlighted by Judge Huvelle—the fact that the Navy already made the "express decision" not to "limit chaplains' religious activities" during the shutdown. Opp. at 33 (citing <u>Leonard</u>, 38 F. Supp. 3d at 106). Because the Navy allowed Father Leonard to continue performing his ecclesiastical duties during the last shutdown, it was improbable that Navy would stop him from doing so during any future shutdown. That, Atlas says, stands in stark contrast to the facts presented here, where the TTB has twice stopped processing COLA applications during government shutdowns, has twice allegedly infringed brewers' free speech rights, and has never made an "express decision" to avoid that alleged First Amendment harm during any prior shutdown. <u>Id.</u>

Atlas is right that this feature of <u>Leonard</u> weakened the plaintiff's capable-of-repetition argument. Atlas also correctly notes the absence of that feature here, which would seem to attenuate <u>Leonard</u>'s relevance to this case. But Atlas overlooks the fact that another contrast between this case and <u>Leonard</u> cuts the other way, making this case a comparatively weaker candidate for the capable-of-repetition exception. In <u>Leonard</u>, a single-day shutdown—provided the government told Leonard he could not perform his duties—would *guarantee* the recurrence of his First Amendment injury, so long as he remained a Navy chaplain. Here, by contrast, a First Amendment deprivation would occur only if Atlas, in addition to remaining in business, had filed a COLA application close in time to the shutdown's onset or filed one after the

shutdown began.  Said another way, the contingency in the *plaintiff*'s control was much more

certain in Leonard than it is here.  To create a ripe First Amendment dispute, all Father Leonard

would have to do if the government-side contingencies were satisfied is keep his job, while Atlas

would have to take a particular action at a particular time to do the same.  And given Atlas's

history of going long stretches without filing for a COLA, that is no minor obstacle.  Thus, the

factual differences that exist between this case and Leonard merely cancel one another out; they

do not augur in favor of a different result.

  In any event, Leonard is but one chapter in an anthology of consonant cases, many of

which do not have the distinguishing feature Atlas highlights in Leonard.  Consider, for instance,

American Federation of Government Employees v. Rivlin, 995 F. Supp. 165 (D.D.C. 1998), on

which Leonard relied.  In Rivlin, government employees, represented by unions, sought a

declaratory judgment that the federal government could not force them to work without pay

during a shutdown.  Id. at 165–66.  The defendants argued the case had been mooted by the

passage of the 1996 budget, and plaintiffs answered that the dispute remained live under the

capable-of-repetition exception.  Id. at 166.  Judge Sullivan rejected plaintiffs' argument and

dismissed the case.  "It would be entirely speculative for this Court to attempt to predict if, and

when, another lapse in appropriations may occur, how long that lapse might be, which agencies

might be subject to the lapse, which employees might be affected, and whether employees will

be required to work without compensation.  Id.  That holding, too, was affirmed by the D.C.

Circuit.  See Am. Fed'n of Gov't Employees, AFL-CIO v. Raines, No. 98-5045, 1998 WL

545417 (D.C. Cir. July 15, 1998).  Although the opinion affirming Rivlin was unpublished, and

therefore is not binding precedent, it is notable that the D.C. Circuit found the issue "so clear as

to warrant summary action."  Id. at *1.

The very same government-side contingencies that <u>Rivlin</u> found too remote are present in this case. A funding gap must occur; it must have an impact on the Treasury; it must last long enough to result in a shutdown of at least some Treasury activities; and Treasury must again choose to pause the processing of COLA applications. And, as the Court explained in its discussion of <u>Leonard</u>, this case contains an additional contingency—the plaintiff taking a particular action at the right time, as opposed to simply maintaining a certain status—that provides further reason to doubt the likelihood of recurrence. Atlas counters that <u>Rivlin</u> cannot guide the analysis in this case because the court there "did not fully review the history of shutdowns, and obviously, was not in a position to consider the many shutdowns that have occurred since." Opp. at 33. But that argument addresses just one of the contingencies—the likelihood of a shutdown—which this Court has already explained stands as the lowest hurdle for Atlas in this case. Atlas has no answer for the remaining hurdles that <u>Rivlin</u> identified and that stand in its way here.

The government also urges on the Court, among other cases, <u>Alaska v. Jewell</u>, No. 13-cv-34, 2014 WL 3778590 (D. Alaska July 29, 2014), and <u>Foster v. Carson</u>, 347 F.3d 742 (9th Cir. 2003). Both are instructive. In <u>Jewell</u>, involving the 2013 federal shutdown, the district court rejected the plaintiff's argument that a national wildlife refuge would be closed during the next hypothetical shutdown because "the only fact in the record before the Court that suggests a refuge closure may happen again is the fact that it happened once." 2014 WL 3778590, at *3. For support, <u>Jewell</u> cited <u>Foster</u>, a case involving an Oregon budget shortfall, which also rejected a capable-of-repetition argument because "the only fact in the record . . . that supports [the likelihood of recurrence] is that it happened once." 347 F.3d at 748. Atlas contends that both <u>Jewell</u> and <u>Foster</u> are inapposite because the plaintiff there "lacked evidence that previous

shutdowns have ever created the same injury." Opp. at 34.  But the plaintiffs in those cases had essentially what Atlas has here: an allegation that it was injured during the immediately preceding shutdown.  The only difference is that the TTB has stopped processing COLA applications *twice* (in 2018–19 and 2013) as opposed to just *once* (although Atlas was not affected by the 2013 shutdown).  Jewell and Foster yield no indication the result would have been different with one additional data point about the government's track record.  They therefore remain useful guideposts.

The cases Atlas has offered, meanwhile, are not much help.  The case Atlas says is "[d]irectly on-point," Pratt v. Wilson, 770 F. Supp. 539 (E.D. Cal. 1991), is anything but.  That case involved a class-action challenge to the state of California's refusal, due to a budget impasse, to provide benefits pursuant to the state's Aid to Families with Dependent Children ("AFDC") program.  Id. at 540.  The impasse ended, but the court held that the dispute remained live because it was capable of repetition.  Id. at 543.  The court had good reasons for doing so, but many of those reasons are absent here.  For one thing, the government-side contingencies appeared far less speculative.  At the time plaintiffs filed suit, California had failed to "timely adopt[] a budget in five of the last eight years" and the same plaintiff class had previously been denied AFDC benefits during a shutdown.  Id.  But more important for present purposes is what the Pratt court did not discuss: the plaintiff-side contingencies.  Chief among these, plaintiffs were a class, and ostensibly one that would *always* have eligible members.  No matter when the next California budget crisis occurred, it seems reasonable to assume there would always be some residents affected by a stoppage of AFDC benefits.  The facts here are different.  Even after the government-controlled conditions are satisfied—a funding lapse affecting Treasury long

enough to cause a shutdown, and Treasury carrying out the same contingency plan it did the last time—Atlas, and Atlas alone, would have to file for a COLA at just the right time.

Biggs v. Wilson, 828 F. Supp. 774 (E.D. Cal. 1991), which Atlas also cites, is even further afield.  There, the 1990 California budget impasse caused the paychecks of plaintiffs, California Department of Transportation employees, to be delayed, and the employees alleged this violated the Fair Labor Standards Act's prompt-payment requirement.  Id. at 775.  Biggs, however, makes for a poor fit with this case.  For starters, neither the word "mootness" nor the phrase "capable of repetition" even appears in the decision.  Therefore, while Biggs may have remarked on the likelihood of another California budget impasse, it was clearly not doing so under the rubric that controls the Court's inquiry in this case.  What's more, beyond the possibility of a funding gap alone, the Biggs court discusses exactly none of the contingencies that animate the Court's capable-of-repetition anlysis here.  Biggs is inapposite.

So what does this comparison to relevant case law reveal?  It shows that this case is far closer factually to the cases where courts have declined to find shutdown-contingent disputes capable of repetition than it is to the few cases that have concluded otherwise.  This case sits comfortably alongside Leonard, Rivlin, and other decisions holding that shutdown-related disputes are not sufficiently capable of repetition.  The very same contingencies those district courts (and the D.C. Circuit) found too speculative are present in this case, and they point to the same conclusion.

But there is one other feature of this case that makes it even less suited to the capable-of-repetition exception than any that the parties have cited or that the Court has uncovered: the fact that Atlas, to some extent, can control whether or not a hypothetical future shutdown causes them any injury at all.  As alluded to earlier, Atlas is to some extent free to choose when to seek

COLA approval.  Indeed, in planning the release of new beers, Atlas admits that it "builds in . . .

three weeks for TTB approval."  Cox Decl. ¶ 12.  Combined with the fact that speculation

regarding an impending shutdown begins well in advance of the actual event, that means Atlas

can possibly avoid, or at least mitigate, the harm caused by a future shutdown—and it makes the

chasm between this case and Atlas's favored authorities wider still.  In cases like Pratt and Biggs,

there was nothing the plaintiffs could do to avoid the legal wrong in the event of another state

shutdown, save for relinquishing their entitlement to benefits in Pratt or quitting their jobs in

Biggs.  They could not, for example, demand an advance on their benefits or pay that would

obviate the pain of the shutdown; Atlas can, however, accelerate their COLA process if a

shutdown seems likely. This is, of course, not to say that the blame for any potential First

Amendment deprivation or economic harm caused by a future shutdown should lie exclusively,

or even primarily, at the feet of Atlas.  But it is to say that, to the extent Atlas genuinely wishes

to avoid a First Amendment injury and any concomitant business loss, it could plan the COLA

process with an eye toward any looming shutdown.  That Atlas has at least some ability to avoid

the alleged injury that gave rise to this lawsuit, and that Atlas might rationally try to do so,

further lessens the likelihood that it will recur.  That is the final reason why this case does not

present the sort of "exceptional situation[]" fit for the capable-of-repetition exception.  See City

of Los Angeles, 461 U.S. at 109.

*        *        *

As the passage of time can skunk a beer, so too can it spoil a lawsuit.  Atlas came to this

Court because it believed the government shutdown resulted in a *de facto* ban on protected

speech and because it feared that The Precious One's purgatory might become a permanent loss.

When the government turned the lights back on, however, Atlas regained its ability to speak via

28

its labels, and The Precious One was liberated from Atlas's tanks.  Despite the brewer's

protestations that it will likely suffer the same harms in the future, the Court sees too many

contingencies that would have to coincide for that to happen.  As a consequence, this case is now

moot, and the Court therefore must dismiss it.

**IV.   Conclusion**

For the foregoing reasons, the Court will grant the government's motion to dismiss.  A

separate Order accompanies this Memorandum Opinion.


_____
CHRISTOPHER R. COOPER
United States District Judge

Date:  <u>July 31, 2019</u>